UNITED STATES of America, Appellee,

v.

George RIVERA, Ward Johnson, Walter David Cook, Luis Gautier, Ralph Hernandez, Jaime Cuevas, Victor Briggs, Anthony Briggs, Willie Claussen, Kenroy Prentice, Bob Lemon, John Doe, Elizabeth Velasquez, Desiree Sidberry, Ketty Turino, Andrew Simmons, Ruben Rodriguez, John Marrero, Raymond Marrero, Vickie Dowdy, Madeline Rodriguez, Mark Sanchez, Albert Delmoral, Edgardo Delmoral, Anthony Garay, Veronica Aviles, Matthew Williams, Jonathan Lane Morris, Danny Delgado, Anthony Rivera, Michael Cole, Marshall Harrison, Dennis Lynch, Arycelis Turino, and Anthony Cruz, Defendants,

George Rivera, Victor Briggs, Ketty Turino, Andrew Simmons, Vickie Dowdy, Madeline Rodriguez, Anthony Garay, Danny Delgado, Arycelis Turino, and Anthony Cruz, Defendants–Appellants.

Nos. 731, 29, 836, 835, 736, 732, 728 and 730, Dockets 91–1027, 91–1118, 91–1122, 91–1132, 91–1133, 91–1214, 91–1337 and 91–1450.

United States Court of Appeals, Second Circuit.

Argued Jan. 6, 1992.

Decided July 30, 1992.

Michael Young, New York City, for defendant-appellant George Rivera.

Lloyd Epstein, (Epstein, Hus & Weil, New York City, of counsel), for defendant-appellant Victor Briggs.

Robert M. Beecher, New York City, for defendant-appellant Andrew Simmons.

Casey Donovan, New York City, for defendant-appellant Madeline Rodriguez.

Irving B. Cohen, New York City, for defendant-appellant Danny Delgado.

Sanford M. Katz, New York City, for defendant-appellant Anthony Cruz.

Patrick J. Fitzgerald, Asst. U.S. Atty. (Otto G. Obermaier, U.S. Atty., Henry De-Pippo, James B. Comey, Asst. U.S. Attys., S.D.N.Y., New York City, of counsel), for appellee.

Lee Ginsberg (Freeman, Nooter & Ginsberg, New York City, of counsel), for defendant-appellant Ketty Turino.

Before: ALTIMARI, MAHONEY, and WALKER, Circuit Judges.

J. DANIEL MAHONEY, Circuit Judge:

Defendants-appellants George Rivera (also known as "Boy George"), Ketty Turino ("K. Turino"), Vickie Dowdy, Anthony Garay, Danny Delgado, Arycelis Turino ("A. Turino"), and Anthony Cruz appeal from judgments of conviction for engaging in a conspiracy to distribute heroin and (in the case of Rivera) attempted income tax evasion entered, after a jury trial, in the United States District Court for the Southern District of New York, Shirley Wohl Kram, *Judge*.[1] Defendants-appellants Victor Briggs, Andrew Simmons, and Madeline Rodriguez appeal from sentences imposed in the same court following their guilty pleas as to a conspiracy to distribute heroin and, in the case of Simmons and Rodriguez, a federal firearm violation.

---

1. Notices of appeal were filed on behalf of Dowdy, No. 91–1134, and Garay, No. 91–1131, but their appeals were subsequently withdrawn by stipulated orders. No brief was filed or oral argument made on this appeal in behalf of A. Turino, who filed a letter joining in the arguments of her codefendants, to the extent applicable to her and not inconsistent with her position.

A fourteen-count indictment filed on June 7, 1990, charged that defendants-appellants Rivera, K. Turino, Delgado, A. Turino, and Cruz (as well as ultimately acquitted defendant Dennis Lynch) were members of a conspiracy to distribute heroin at the street level that operated in the south Bronx and Manhattan. Count one charged them with conspiring from 1987 to 1989 to distribute and to possess with intent to distribute in excess of one kilogram of heroin, in violation of 21 U.S.C. § 846 (1988). Count two charged Rivera with operating a continuing criminal enterprise from 1987 to 1989, in violation of 21 U.S.C. § 848(a)-(b) (1988). Counts three through nine charged Rivera, and count four also charged A. Turino, with distributing and possessing with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) (1988) and related provisions. Counts ten through thirteen charged Rivera with using and carrying firearms during drug trafficking crimes in violation of 18 U.S.C. § 924(c) (1988 & Supp. II 1990). Count fourteen charged Rivera with attempted income tax evasion for the calendar year 1988 in violation of 26 U.S.C. § 7201 (1988).

Following a jury trial, Rivera, K. Turino, Delgado, A. Turino, and Cruz were convicted of the heroin conspiracy charged in count one. Rivera was convicted of the attempted tax evasion charged in count fourteen. A. Turino was acquitted of the narcotics distribution charged against her in count four. The jury was unable to reach a verdict on the remaining counts against Rivera, and the court declared a mistrial on these counts.

Briggs, Simmons, and Rodriguez pled guilty to counts in an earlier, similar indictment. Briggs pled guilty to a conspiracy to distribute in excess of one kilogram of heroin, in violation of 21 U.S.C. § 846 (1988). Simmons and Rodriguez each pled guilty to a conspiracy to distribute 100 grams or more of heroin, in violation of 21 U.S.C. § 846 (1988), and to one count of using or carrying a firearm during a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (1988 & Supp. II 1990).

The district court sentenced defendants-appellants as follows: Rivera to life imprisonment and a $25,000 fine; K. Turino to 121 months imprisonment; Delgado to 240 months imprisonment; A. Turino to 135 months imprisonment; Cruz to 365 months imprisonment; Briggs to 188 months imprisonment and a $17,500 fine; Simmons to 78 months imprisonment for conspiracy and a consecutive 60 months for the firearms violation; and Rodriguez to 63 months imprisonment for conspiracy and a consecutive 60 months for the firearms violation. In addition, the court sentenced all defendants-appellants to five years supervised release and the mandatory assessments imposed by 18 U.S.C. § 3013 (1988 & Supp. II 1990).

The claims on appeal are fully outlined in the discussion that follows. For the reasons there stated, we affirm the judgments of conviction, except that we vacate the sentence of Victor Briggs and remand for reconsideration of his sentence with respect to the $17,500 fine imposed upon him.

## Background

Defendants-appellants and numerous others participated in a highly structured, street-level heroin distribution organization in the south Bronx and Manhattan. The operation was developed by Rivera and sold heroin under the brand names "Obsession," "Sledge Hammer," and "Delirious." The organization maintained a "cutting mill" or "table," at which pure heroin was diluted and packaged in ten dollar glassine envelopes stamped with a brand name. The location of the mill varied from time to time. After packaging, the heroin was delivered to distribution locations.

There were five principal distribution outlets, called "spots" or "stores": (1) 166th Street and Washington Avenue in the Bronx; (2) Avenue St. John and Southern Boulevard in the Bronx; (3) 139th Street and Brook Avenue in the Bronx; (4) 122nd Street and Second Avenue in Manhattan; and (5) 156th Street and Courtlandt Avenue in the Bronx. The spots were run by "spot owners" who employed a variety of street managers, sellers, steerers, lookouts, and

other assistants. The spot owners kept a percentage of the proceeds of the heroin sales, from which they paid their employees, and remitted the remainder to Rivera.

Defendants-appellants occupied various positions in the organization. The government alleged that: (1) Rivera controlled it; (2) Cruz started as a worker at 156th St./Courtlandt Ave. and became its spot owner in the fall of 1988; (3) Delgado started as a worker at 156th St./Courtlandt Ave. and became its street manager; (4) Briggs was the spot owner of Ave. St. John/Southern Blvd. after September 1988; and (5) A. Turino, K. Turino, Simmons, and Rodriguez were cutting-mill workers.

The principal prosecution witnesses were Ward Johnson, Rivera's second-in-command, and Luis Gautier, who was responsible for delivering the heroin from the mill to the street outlets and collecting the proceeds after the sales. The testimony at trial included the following.

The operation began in the spring of 1987, when Rivera and Johnson obtained one hundred grams of bulk heroin. With the help of about a dozen mill workers, including A. Turino and Gautier, they cut and packaged the heroin in Rivera's apartment on East 213th Street in the Bronx. During the summer of 1987, the organization distributed about $100,00 worth of heroin a week.

By August 1987, the police had learned of the Rivera operation from Joey Navado, a confidential informant. On August 27, Navado introduced Rivera as "Boy George" to undercover detective Joseph Mendez, who bought two ounces of 88%-pure heroin from Rivera for $12,000. At the meeting, Rivera claimed that his organization distributed two kilograms ($250,-000 worth) of heroin a week.

After a burglary scare, Rivera abandoned his East 213th Street apartment and moved the cutting mill to the Manhattan Marriott Marquis. In August or September of 1987, police officers who were looking for Rivera in an unrelated investigation located the abandoned 213th Street apartment, where they found glassine envelopes, heroin cutting paraphernalia, a Bowie knife, a bulletproof vest, a shotgun, and a variety of ammunition. When he learned of the seizure, Rivera switched the heroin brand name to "Delirious," but soon returned to "Obsession" because his customers had developed a loyalty to that name.

On October 6, 1987, Navado and Mendez met with Rivera, Johnson, and A. Turino. Mendez bought 600 glassine envelopes of the leftover "Delirious" for $5,000. Rivera conducted no further transactions with Mendez, because Johnson correctly surmised that Mendez was an undercover officer.

Soon thereafter, Rivera relocated the cutting mill from the Marriott Marquis to the apartment of one of his workers, and it was subsequently moved to other homes and apartments. In the late summer of 1988, Rivera started a "Sledge Hammer" brand, usually more diluted than "Obsession," and appointed Walter David Cook to supervise its distribution.

Rivera used some of the proceeds of the operation to purchase a house in Puerto Rico for $145,000 in cash. He extensively remodeled the house, including the installation of an outdoor pool with the words "Obsession" and the initials "B.G." (for "Boy George") tiled in the bottom. He also purchased a number of customized luxury cars.

On December 24, 1988, Rivera threw a black tie party for his entire organization aboard a chartered yacht. Rivera paid for the tuxedo rentals, dinner, open bar, and entertainment (including a raffle with luxury prizes). The partygoers were seated at tables organized by "spot" location. At trial, the government introduced in evidence a photo album seized from Rivera's apartment that contained pictures of the occasion.

At the party, Rivera gave $50,000 in cash and a Rolex watch to Johnson, a customized BMW automobile to Cook, and solid gold belt buckles with the recipient's name inscribed in diamonds to a number of the spot owners and managers. The government introduced some of the belt buckles into evidence at trial. A buckle for Cruz

was not introduced into evidence, and there were no pictures of Cruz receiving a buckle.

On April 4, 1989, the New York police obtained authorization to wiretap Rivera's home phone at 1665 Morris Avenue in the Bronx. The tap remained for twenty-seven days, and fifty-eight recorded conversations were introduced into evidence. These conversations provided a detailed picture of the ongoing heroin conspiracy and Rivera's control over it.

On the evening of April 30, 1989, New York police established surveillance of the cutting mill then in operation at an apartment at 740 East 243rd Street in the Bronx. Upon leaving the apartment that evening, defendant Jaime Cuevas was arrested with 10,400 glassine envelopes of "Obsession" heroin. When Gautier and defendant Ralph Hernandez subsequently left the apartment, they were arrested with 8,718 "Obsession" glassine envelopes.

At approximately 2:30 a.m. on May 1, 1989, the police executed a search warrant on the mill apartment. Eleven workers were arrested, and the officers seized approximately 1.1 kilograms of heroin, five loaded weapons, over 100,000 empty glassine envelopes bearing the "Obsession" or "Sledge Hammer" logo, dozens of blocks of cutting agent, a triple-beam scale, four grinding machines, other processing materials, and a spiral notebook containing 1989 production records for the organization's mills.

Rivera was arrested outside his apartment building the next morning. He was carrying $7,500 in cash. A warrant was then obtained, and Rivera's apartment was searched. Police found there $1,000 in cash, a life-size crown similar to that depicted in the "Obsession" logo, address books with telephone numbers of his employees, ammunition, payroll records, drug transaction records, and raffle tickets from the Christmas party. Shortly therafter, Johnson was arrested, and his apartment was also searched pursuant to a warrant. The search revealed detailed drug ledgers for 1987 and 1988.

The initial and superseding indictments were thereafter returned, and trial commenced on August 27, 1990. The jury returned its partial verdicts on November 16, 1990, and the court declared a mistrial on the remaining counts on November 20, 1990. This appeal followed.

Further factual matters will be set forth in the discussion of the issues to which they relate.

## Discussion

Defendants-appellants urge numerous grounds for reversal, and most join in each other's arguments (to the extent generally applicable) pursuant to Fed.R.App.P. 28(i). We consider: (a) Rivera's claims of prosecutorial misconduct in the government's summations; (b) contentions that the trial court made improper evidentiary rulings in (1) restricting cross-examination on and evidence of informant Navado's role in the conspiracy, (2) allowing Detective Mendez' expert testimony regarding heroin production, distribution, and use, (3) admitting prosecution witness Johnson's unredacted cooperation agreement, and (4) allowing two case agent-witnesses to remain in the courtroom during trial; (c) Delgado's claim of insufficient evidence to connect him to the narcotics conspiracy; and (d) claims of improper sentences by (1) Cruz and Delgado, challenging their respective base offense levels, (2) Cruz, challenging the upward enhancements of his sentence because of his managerial role, intent to obstruct justice, and past violent acts, (3) Briggs, challenging his $17,500 fine, and (4) Simmons and Rodriguez, challenging their respective base offense levels.

### A. Prosecutorial Misconduct in the Government's Summations.

■ Rivera alleges that prosecutorial misconduct in the government's initial and rebuttal summations deprived him of a fair trial. According to Rivera, the prosecution engaged in *ad hominem* attacks on his counsel, improperly appealed to the jurors' self-respect, expressed inappropriate personal opinions that included improper vouching for government witnesses, shift-

ed the burden of proof to the defense, and imputed fear of the defendants to government witnesses.

Rivera claims that the prosecutors initiated *ad hominem* attacks against Rivera's trial counsel by referring to him as a "know-it-all" and "Mr. Thorough." These characterizations were made in response to Rivera's counsel's arguments that he had obtained material from many sources, including private investigators, and was "very thorough." They also responded, less directly, to the contention of Rivera's counsel that he was presenting the "truth" of the case, as distinguished from the prosecution's representations. For example, Rivera's counsel asserted, in his opening statement: "[Cooperating witness] Ward Johnson has a great motive to follow [the prosecutors'] script and not be truthful in this case. Will Ward Johnson tell their truth or the truth during the course of his testimony?"

Rivera also argues that the prosecutors attacked his counsel's credibility and integrity, pointing to numerous characterizations of Rivera's case as "smoke screens," game-playing, distractions, and distortions. This aspect of the government's advocacy is summarized in its rebuttal summation, in which the prosecutor stated that Rivera's counsel

> tries to pretend that he knows it all, what he wants you to do is not focus on the evidence of his client's guilt but to take his word for it that he is the know-it-all, and he is the one that is saying this is a grand government conspiracy and that makes it all true.
>
> . . . .
>
> Well, the judge will tell you that nothing out of this man's mouth, nothing out of my mouth, nothing out of any of our mouths is evidence.

The prosecutor's remarks were legitimate responses to counsel's arguments that Rivera had, in essence, been framed by the cooperating witnesses and the government. The challenged statements were an attempt to focus the jury's attention upon the evidence and away from defense counsel's claims. *See United States v.*

*McDermott,* 918 F.2d 319, 328 (2d Cir.1990) (prosecutor's comments regarding government witnesses deemed proper response to defense argument of conspiracy against defendants), *cert. denied,* —— U.S. ——, 111 S.Ct. 1681, 114 L.Ed.2d 76 (1991); *United States v. Praetorius,* 622 F.2d 1054, 1060–61 (2d Cir.) ("when the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with 'rebutting language suitable to the occasion' ") (quoting *United States v. LaSorsa,* 480 F.2d 522, 526 (2d Cir.), *cert. denied,* 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973)), *cert. denied,* 449 U.S. 860, 101 S.Ct. 162, 66 L.Ed.2d 76 (1980); *cf. United States v. Friedman,* 909 F.2d 705, 709 (2d Cir.1990) (prosecutor's repeated misconduct in rebuttal, including statement that defense counsel "will make any argument he can to get that guy off," held reversible error).

Rivera argues in his reply brief that in *United States v. Young,* 470 U.S. 1, 12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985), the Supreme Court undermined the doctrine of "invited response" in such a manner as to require reversal here. We disagree. Although the Court pointed out that the doctrine is not a "prosecutor's license to make otherwise improper arguments," *id.,* and encouraged "prompt action from the bench in the form of corrective instructions to the jury and, when necessary, an admonition to the errant advocate" to cut off improper arguments by both prosecution and defense counsel, *id.* at 13, 105 S.Ct. at 1045, the Court did not foreclose the possibility that defense argument may, in a proper case, "open the door" to otherwise inadmissible prosecution rebuttal. This was made clear in *United States v. Robinson,* 485 U.S. 25, 108 S.Ct. 864, 99 L.Ed.2d 23 (1988), in which the Court deemed appropriate an otherwise impermissible prosecution comment upon the defendant's failure to testify in view of the defense's closing argument that the government had not allowed the defendant to explain his side of the case. *Id.* at 27 & n. 2, 32–33, 108 S.Ct. at 865 & n. 2, 868–869.

■ Rivera also argues that the prosecutors improperly appealed to the jurors' self-respect in order to prejudice them against his counsel. In its main summation, the prosecution stressed that differing recollections of events by different jurors were to be expected. In its rebuttal summation, government counsel stated that in the event of such variances, "[Rivera's counsel] can start screaming at you that you are all liars," an implicit comparison to Rivera's cross-examination of government witnesses. The government concedes that this remark was "arguably improper," but contends that it was isolated and not prejudicial. For reasons stated *infra*, we agree that no reversible error occurred.

■ Rivera claims that the prosecutors improperly stated their personal opinions that defense arguments were "ridiculous" or the government's evidence was "overwhelming," and the like, and improperly vouched for the government's witnesses. Rivera cites in this regard *United States v. Drummond*, 481 F.2d 62 (2d Cir.1973), in which we reversed a conviction "[b]ecause of the repeated misbehavior of this prosecutor in this and prior cases." *Id.* at 62; *see also United States v. Fernandez*, 480 F.2d 726, 741 n. 23 (2d Cir.1973) (prior rebuke of same prosecutor). We see no legitimate comparison to *Drummond* in this case. It is true that the prosecutor in *Drummond* described the defense position as "preposterous," 481 F.2d at 64, but we reversed because he "interjected his beliefs and made an issue of his own credibility," *id.*, and also misrepresented trial testimony, *id.*, not because of adjectival excess. A prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation. *See United States v. Wilner*, 523 F.2d 68, 74 (2d Cir.1975). After reviewing the government's summations, we conclude that the government's arguments were permissible inferences from the evidence at trial, and did not constitute improper vouching for the prosecutor's witnesses.

■ Rivera contends that the prosecution improperly shifted the burden of proof in its rebuttal summation regarding Delgado.[2] Delgado's counsel argued in summation that Delgado was unlikely to be a major participant in the conspiracy because the police officer who arrested Delgado for drug possession testified on cross-examination that he was "surprised" to be testifying against Delgado in a federal narcotics prosecution. In its rebuttal summation, the prosecution noted that the officer was never asked by the defense why he was surprised.

The government is entitled to comment on a defendant's failure to call witnesses to support his arguments. *McDermott*, 918 F.2d at 327. Further, " '[a]n observation [in summation] that evidence adduced by the Government was not confronted on cross-examination is entirely proper.' " *United States v. Torres*, 901 F.2d 205, 246 (2d Cir.) (quoting *United States v. Walker*, 835 F.2d 983, 989 (2d Cir.1987)), *cert. denied*, —— U.S. ——, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990); *see also Polizzi v. United States*, 926 F.2d 1311, 1321–22 (2d Cir.1991). By extension, the government may also comment upon defense counsel's failure fully to cross-examine a witness concerning a particular subject.

In any event, the trial judge gave a curative jury instruction that:

At one point the Government may have suggested that certain questions should have been asked by [defense counsel] of Detective [Marren], but it was not his burden to do so. The Government always has the burden of proof. I want you to know that that never shifts.

Thus, if the prosecutor's comments regarding further questioning of the witness confused the jury concerning the government's burden of proof, the trial court's instruction, combined with the subsequent charge on the burden of proof, cured any possible prejudice to Delgado. *See United States v. Parker*, 903 F.2d 91, 99 (2d Cir.), *cert. denied*, —— U.S. ——, ——, 111 S.Ct.

---

**2.** It is difficult to imagine that Rivera has standing to advance this contention in behalf of Delgado, but we nonetheless entertain it because

Delgado's brief explicitly adopts the arguments of his codefendants insofar as they apply to him.

196, 201, 112 L.Ed.2d 158 (1990); *Walker*, 835 F.2d at 989.

■ Finally, Rivera argues that the prosecutors improperly imputed fear of the defendants to government witnesses. As we read the record, Rivera's counsel asserted in summation that Gautier had become unwilling, as his testimony progressed, to look the *jury* in the eye because Gautier was lying. The government contends that Rivera's counsel was commenting upon an asserted inability by Gautier *and Johnson* to look at *Rivera* because their testimony was untruthful. In any event, the government argued in rebuttal that:

> you saw [Johnson and Gautier] turn their chairs both toward you and away from George Rivera, and some of you, at the beginning of their testimony saw what happened. You can infer, as [Rivera's counsel] would have you believe, that he was lying. You could also infer that these people were fearful.

Upon objection by Rivera's counsel, the court cut off this line of argument at this juncture, but refused to strike the quoted passage.

We have stated that "[a] prosecutor is free to comment upon the evidence, including demeanor." *United States v. Modica*, 663 F.2d 1173, 1180 (2d Cir.1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). Here, the prosecutor simply offered the jury an alternative explanation for the demeanor of government witnesses in response to a defense argument regarding demeanor. Although in our view the prosecution somewhat misconceived the defense argument to which the rebuttal summation responded, the summation was nonetheless essentially responsive. In any event, the court cut off any further elaboration of this theme, although refusing to strike the quoted passage. We perceive no error.

In sum, the challenged remarks by the prosecutors were, for the most part, permissible responses to arguments, remarks, and tactics of Rivera's counsel. The only substantially improper remark by the prosecutor was his assertion that varying recollections by the jurors would lead Rivera's

counsel to condemn them as "liars." Viewed in the context of a lengthy and heated trial in which overwhelming evidence of a heroin conspiracy was adduced, this hardly merits reversal. *See Young*, 470 U.S. at 11, 105 S.Ct. at 1044 ("the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial"); *see also Darden v. Wainwright*, 477 U.S. 168, 181–82, 106 S.Ct. 2464, 2471–72, 91 L.Ed.2d 144 (1986) (same); *United States v. Biasucci*, 786 F.2d 504, 514 (2d Cir.) ("criminal convictions are not to be lightly overturned on the basis of a prosecutor's inappropriate comments standing alone in an otherwise fair proceeding"), *cert. denied*, 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986). In addition, in determining a claim of prejudicial error, we weigh "the extent to which the misconduct was intentional and the extent to which the statements were made in response to defense contentions." *Modica*, 663 F.2d at 1181. We conclude that no reversible error resulted from the prosecution's summations.

### B. *Evidentiary Rulings.*

■ Defendants-appellants challenge various evidentiary rulings made by the district court. Before turning to their specific claims, "we recognize 'the long held view of this Circuit that the trial judge is in the best position to weigh competing interests in deciding whether or not to admit certain evidence.'" *Torres*, 901 F.2d at 234 (quoting *United States v. Moon*, 718 F.2d 1210, 1232 (2d Cir.1983), *cert. denied*, 466 U.S. 971, 104 S.Ct. 2344, 80 L.Ed.2d 818 (1984)). Thus, we will not overturn a trial court's decision to admit or reject evidence unless we conclude that there has been an abuse of discretion. *Torres*, 901 F.2d at 234; *Moon*, 718 F.2d at 1232.

1. Restrictions of Cross–Examination on and Evidence of "Navado Defense".

One of Rivera's defenses was that Joey Navado, a government informant, had in fact been the head of the "Obsession" con-

spiracy and had used Rivera as a front man. Rivera contends that Navado and the main government witnesses at trial conspired to frame Rivera and lessen the witnesses' individual culpability.

On October 24, 1990, Rivera submitted a "proffer" letter outlining matters regarding the Navado defense that he would have developed if he had been allowed (1) to examine more fully Johnson, Gautier, and detective Wilfred Cebollero, and (2) to have immunity granted to Barry Smith, not previously a witness, to make him available for defense examination in view of Smith's invocation of his Fifth Amendment right against self-incrimination. Rivera claimed that he would have established: (1) Navado's ownership of a certain Mercedes–Benz automobile whose ownership the government attributed to Rivera; (2) Navado's leadership of the heroin conspiracy and Rivera's corresponding status as a figurehead; (3) the knowledge of Cebellero and Gautier regarding Navado's drug dealing; and (4) the knowledge of Smith, a customizer of automobiles, that Navado, rather than Rivera, was the party-in-interest regarding customized luxury vehicles that were the subject of trial testimony. Rivera sought to recall Johnson, Gautier, and Cebollero, and to have immunity granted to Smith.

The district court denied Rivera's request to recall Johnson and Gautier, but allowed Cebollero to be called as a defense witness. The district court also denied Rivera's request that Smith be immunized. Rivera contends that these rulings prevented him from presenting his defense regarding the alleged involvement and status of Navado.

■ Under Fed.R.Evid. 611(a), the district court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." The court is accorded broad discretion in controlling the scope and extent of cross-examination. *United States v. Lanza,* 790 F.2d 1015, 1020 (2d Cir.), *cert. denied,* 479 U.S.

861, 107 S.Ct. 211, 93 L.Ed.2d 141 (1986); *United States v. Singh,* 628 F.2d 758, 763 (2d Cir.), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 609, 66 L.Ed.2d 496 (1980). "A trial judge does not abuse his discretion by curtailing cross-examination as long as the jury has 'sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government.'" *United States v. Scarpa,* 913 F.2d 993, 1018 (2d Cir.1990) (quoting *Singh,* 628 F.2d at 763); *see also United States v. Blanco,* 861 F.2d 773, 781 (2d Cir.1988), *cert. denied,* 489 U.S. 1019, 109 S.Ct. 1139, 103 L.Ed.2d 200 (1989).

■ The district court did not allow Rivera to recall Johnson or Gautier, but Rivera had already cross-examined these witnesses extensively, and had elicited testimony directly contradicting his proffer from both Johnson and Gautier as to ownership of the Mercedes Benz, and from Gautier as to Navado's alleged drug dealing. The court's refusal to allow further cross-examination of these witnesses was not an abuse of discretion.

■ Rivera also claims that his initial cross-examination, and subsequent examination as a defense witness, of Cebollero was improperly restricted so as to prevent Rivera's development of the Navado theory of defense. During Cebollero's cross-examination, however, Rivera repeatedly attempted to impeach the credibility of Navado. The district court properly sustained objections to his tactic. *See* Fed.R.Evid. 611(b) ("Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility *of the witness.*" (emphasis added)). In addition, Cebollero was extensively questioned, during his examination as a defense witness, concerning Navado's drug dealing prior to his arrest and enlistment as a police informant, and regarding charges of criminal activity that were brought against Navado while serving as a police informant. We discern no improper curtailment of the defense's examination of Cebollero.

■ The district court's decision not to order immunization of Smith was also proper. "Absent exceptional circumstances, the

Due Process Clause imposes no requirement that defense witness immunity be ordered 'whenever it seems fair to grant it.'" *Blissett v. Lefevre*, 924 F.2d 434, 441 (2d Cir.) (quoting *United States v. Turkish*, 623 F.2d 769, 777 (2d Cir.1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981)), *cert. denied*, — U.S. —, 112 S.Ct. 158, 116 L.Ed.2d 123 (1991). Defense witness immunity is required only upon a showing that "(1) the government has engaged in discriminatory use of immunity to gain a tactical advantage or, through its own overreaching, has forced the witness to invoke the Fifth Amendment; and (2) the witness' testimony will be material, exculpatory and not cumulative and is not obtainable from any other source." *United States v. Burns*, 684 F.2d 1066, 1077 (2d Cir.1982) (citing *Turkish*, 623 F.2d at 776–78; *United States v. Gleason*, 616 F.2d 2, 28 (2d Cir.1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767, 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980)), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983); *see also United States v. Bahadar*, 954 F.2d 821, 825–26 (2d Cir.), *petition for cert. filed*, No. 91–8598 (June 12, 1992); *Blissett*, 924 F.2d at 442–43; *United States v. Pinto*, 850 F.2d 927, 935 (2d Cir.), *cert. denied*, 488 U.S. 867, 932, 109 S.Ct. 174, 323, 102 L.Ed.2d 143, 341 (1988).

Rivera sought Smith's testimony regarding automobile customizing to impeach Johnson and Gautier, because it would allegedly have been inconsistent with their testimony. Rivera has not even attempted, however, to show compliance with the requirements that our decisions have consistently required to compel a governmental grant of immunity, and it is clear that they were not satisfied with respect to the peripheral testimony assertedly available from Smith.

2. Detective Mendez' Expert Testimony.

█ Mendez, the government's first witness, gave prefatory testimony as an expert regarding heroin production, distribution, and use. He explained that heroin was typically sold to users in powder form and ingested in liquid form. He testified that heroin is usually bought by dealers in bulk form ("bricks"), reduced into powder, mixed with other ingredients ("cut"), packaged, and sold in glassine envelopes stamped with a brand name. He also explained and defined terminology used in the drug trade. Mendez then testified regarding his two undercover purchases of heroin from Rivera on August 27 and October 6, 1987. K. Turino contends that Mendez' expert testimony was irrelevant, and related to matters within the ken of the jurors without expert assistance.

Under Fed.R.Evid. 702, expert testimony is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." In addition, the testimony must meet the requirement of relevance stated in Fed.R.Evid. 401. The trial court has broad discretion regarding the admission of expert testimony, and its decision "'will be sustained unless manifestly erroneous.'" *Torres*, 901 F.2d at 237 (quoting *United States v. Nersesian*, 824 F.2d 1294, 1308 (2d Cir.), *cert. denied*, 484 U.S. 957, 958, 1061, 108 S.Ct. 355, 357, 1018, 98 L.Ed.2d 380, 382, 983 (1987)). Because "jurors ... [are] likely unfamiliar with the words and phrases used by narcotics dealers to camouflage their activities," *United States v. Kusek*, 844 F.2d 942, 949 (2d Cir.), *cert. denied*, 488 U.S. 860, 109 S.Ct. 157, 102 L.Ed.2d 128 (1988), we have repeatedly held that "'the operations of narcotics dealers are a proper subject for expert testimony under Fed.R.Evid. 702.'" *Torres*, 901 F.2d at 237 (quoting *Nersesian*, 824 F.2d at 1308); *see also United States v. Carmona*, 858 F.2d 66, 69 (2d Cir.1988); *Kusek*, 844 F.2d at 949; *United States v. Khan*, 787 F.2d 28, 34 (2d Cir.1986); *United States v. Brown*, 776 F.2d 397, 400 (2d Cir.1985), *cert. denied*, 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986); *United States v. Ginsberg*, 758 F.2d 823, 830 (2d Cir.1985); *United States v. Carson*, 702 F.2d 351, 369 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983). We perceive no basis to exclude Mendez' testimony as irrelevant, or as re-

lating to matters concerning which the jury needed no expert assistance.

K. Turino also contends that Mendez' testimony "mixed general testimony regarding unrelated persons with particular testimony concerning the appellants, thereby increasing the likelihood that the jurors would become confused and associate the conduct of unrelated persons with the conduct of the appellant." Although Mendez testified as both a fact witness and an expert witness, such dual testimony is not improper. *United States v. Matos,* 905 F.2d 30, 34 (2d Cir.1990); *United States v. Young,* 745 F.2d 733, 760 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). Mendez testified regarding two undercover purchases of heroin from Rivera; A. Turino participated in one of those purchases. He provided no specific testimony regarding any other defendant-appellant. This factual testimony is hardly likely to have been confused with his brief general testimony regarding heroin production, distribution, and use.

3. Admission of Johnson's Cooperation Agreement Without Redaction.

K. Turino also objects to the admission of Johnson's cooperation agreement because, despite a defense request to do so, the court did not redact a reference to the federal witness protection program before the agreement was admitted into evidence. The defense specifically refers to, and sought to redact, a statement in the agreement "that because Ward Johnson's truthful cooperation with this Office may reveal activities of individuals who in the view of this Office might use violence, force and intimidation against Ward Johnson and his family for the purpose of retaliation or otherwise, upon the written request of Ward Johnson's counsel, this Office will apply on his behalf to the Witness Security Program of the United States Marshal Service . . . ."

During opening statements, defense counsel attacked Johnson's credibility and motives for testifying. Accordingly, during Johnson's direct examination, the trial court properly permitted the government to introduce Johnson's cooperation agreement into evidence. *See United States v. Cosentino,* 844 F.2d 30, 32–35 (2d Cir.) (when witness' credibility attacked in opening argument, both testimonial evidence regarding cooperation and agreement itself admissible on witness' direct examination), *cert. denied,* 488 U.S. 923, 109 S.Ct. 303, 102 L.Ed.2d 322 (1988). The government, however, did not read or display the agreement to the jury, but elicited all the information concerning it from the witness' testimony. The witness protection program was not mentioned in this testimony.

During Gautier's direct testimony, the government similarly elicited testimony regarding his cooperation agreement, but the agreement was not read or displayed to the jury. Defendants again objected to the introduction of the unredacted cooperation agreement. After further discussion, the court redacted the references to the witness protection program from Gautier's agreement and admitted the redacted version into evidence. No party explicitly sought application of this ruling to the Johnson agreement, and the court did not amend its earlier ruling admitting Johnson's unredacted cooperation agreement. The jury never asked to see either agreement during its deliberations concerning the verdict.

Given this record, we see no reasonable possibility of prejudice resulting from the admission of the unredacted Johnson plea agreement. *See United States v. Musacchia,* 900 F.2d 493, 497–98 (2d Cir.1990) (applying harmless error analysis where cooperation agreement improperly admitted into evidence), *cert. denied,* —— U.S. ——, 111 S.Ct. 2887, 115 L.Ed.2d 1052 *vacated in part on other grounds,* 955 F.2d 3 (2d Cir.1991); *United States v. Fernandez,* 829 F.2d 363, 365–66 (2d Cir.1987) (per curiam) (even if cooperation agreement erroneously admitted, any error was harmless where agreement was not read into evidence, prosecutor did not refer to it in his summation, and jury did not consult it during deliberations).

### 4. Presence of Two Case Agents in the Courtroom.

During the trial, Cebollero sat at the prosecution table to assist government counsel in the presentation of their case, and detective Paul Helbock sat at the back of the courtroom to facilitate the presentation of exhibits and witnesses. In a letter dated August 27, 1990 (at the outset of trial) that addressed this situation, Rivera stated:

> We have been informed by [the government] that [Cebollero], one of the case agents ..., will be testifying on behalf of the government regarding various different matters. Additionally, the government has indicated that it intends to have Cebollero sit at counsel table throughout the trial and a second agent, [Helbock], in the rear of the courtroom. We would request that the Court have Cebollero sequestered from the court room pursuant to Rule 15 of the Federal Rules of Evidence so as to prevent him from hearing the testimony of the other witnesses. Alternatively, we request that Cebollero be precluded from sitting at the government counsel table and be placed at the rear of the courtroom and replaced at counsel table by the other agent.
>
> It is our contention that Cebollero's presence at the government table, coupled with the fact that he will be testifying for the government at various points during the trial, will have the effect of prejudicing the jury with respect to its perception of Cebollero's role in the prosecution of the instant matter as well as its evaluation of his credibility.

In a conference the same day, Judge Kram declined to preclude Cebollero from sitting at the counsel table, but stated that she would provide a limiting instruction to the jury concerning the matter. The government disclosed during the conference that Helbock, as well as Cebollero, would testify at trial.

 Rivera argues on appeal that the presence in the courtroom during trial of two agent-witnesses was reversible error as a violation of Fed.R.Evid. 615, which provides:

> At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause.

While the district court made no specific reference to Rule 615 in refusing Rivera's request to exclude Cebollero, the refusal was fully justified under the exemptions provided therein. It is within a trial court's discretion to exempt the government's chief investigative agent from sequestration, *United States v. Pellegrino*, 470 F.2d 1205, 1208 (2d Cir.1972), *cert. denied*, 411 U.S. 918, 93 S.Ct. 1556, 36 L.Ed.2d 310 (1973), and it is well settled that such an exemption is proper under Rule 615(2), deeming the agent-witness a "representative" of the government. *See, e.g., United States v. Pulley*, 922 F.2d 1283, 1285 (6th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 67, 116 L.Ed.2d 42 (1991). Accordingly, we conclude that the trial court properly allowed Cebollero to remain in the courtroom during trial.

 Rivera cites authority for the proposition that only a single case agent may be exempted under 615(2) from a request for exclusion of witnesses. *See id.* at 1286; *United States v. Kosko*, 870 F.2d 162, 164 (4th Cir.), *cert. denied*, 491 U.S. 909, 109 S.Ct. 3197, 105 L.Ed.2d 704 (1989); *United States v. Farnham*, 791 F.2d 331, 334 (4th Cir.1986). That issue does not arise, however, in the instant case. Rule 615 operates "[a]t the request of a party" or when the court "make[s] the order of its own motion." Fed.R.Evid. 615. The only request for witness exclusion was directed solely and specifically at Cebollero. As we concluded above, he was properly exempted from exclusion, and was the only wit-

ness exempted under any provision of Rule 615. Further, the letter seeking sequestration of Cebollero explicitly revealed Rivera's knowledge that the government intended to have both Cebollero and Helbock assisting in the courtroom throughout the trial, and the government made clear in the simultaneous conference concerning this issue that both would be witnesses.

If a request to exclude Helbock, or to allow only one of the detectives to be present in the courtroom, had been made, the government could have attempted to exempt Helbock from exclusion under Rule 615(3) as "a person whose presence is shown by a party to be essential to the presentation of the party's cause." *See Pulley*, 922 F.2d at 1286 (government may seek to exempt two agent-witnesses under different provisions of Rule 615); *United States v. Alvarado*, 647 F.2d 537, 540 (5th Cir. Unit A June 1981) (same). Rivera contends that the government failed to meet its "burden" on this issue. Because no pertinent request was ever made, however, no showing by the government was necessary.

The government contends that because this issue is raised for the first time on appeal, Rivera could obtain relief only if he could demonstrate "plain error[ ] or [a] defect[ ] affecting substantial rights" within the meaning of Fed.R.Crim.P. 52(b). This is clearly correct, and we note that even when a proper request has been made and a trial court has erred by allowing the presence of two agents in the courtroom, courts have ruled that not even Rule 52(a) harmless error, much less Rule 52(b) plain error, occurred. *See Pulley*, 922 F.2d at 1286–87 (error deemed harmless); *Farnham*, 791 F.2d at 335–36 (error harmless as to two of three counts of conviction); *cf. Kosko*, 870 F.2d at 164 (if error had occurred, it would have been harmless). In any event, because of the absence of any request by the defense directed to the presence of two agents during trial, no error of any description is presented by this record.

C. *Sufficiency of the Evidence and Asserted Government Change of Theory as to Delgado.*

Delgado contends that the evidence was insufficient to sustain his conviction for conspiracy to distribute heroin and that the government impermissibly changed its theory as to his criminal behavior during trial from regarding Delgado as a manager of a street spot to portraying him as merely a worker in the conspiracy.

"An appellant challenging the sufficiency of the evidence bears ' " 'a very heavy burden.' " ' " *Torres*, 901 F.2d at 216 (quoting *United States v. Nusraty*, 867 F.2d 759, 762 (2d Cir.1989) (quoting *Young*, 745 F.2d at 762 (quoting *Carson*, 702 F.2d at 361))); *see also United States v. Cervone*, 907 F.2d 332, 343 (2d Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 680, 112 L.Ed.2d 672 (1991). In reviewing sufficiency claims, we "view the evidence in the light most favorable to the government and construe all possible inferences in its favor." *United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir.1986). "The test is 'whether the jury, drawing reasonable inferences from the evidence, may fairly and logically have concluded that the defendant was guilty beyond a reasonable doubt.' " *United States v. Chang An–Lo*, 851 F.2d 547, 554 (2d Cir.) (quoting *United States v. Grubczak*, 793 F.2d 458, 462–63 (2d Cir. 1986)), *cert. denied,* 488 U.S. 966, 109 S.Ct. 493, 102 L.Ed.2d 530 (1988). In addition, "[t]he government is not required 'to preclude every reasonable hypothesis which is consistent with innocence.' " *United States v. Puzzo*, 928 F.2d 1356, 1361 (2d Cir.1991) (quoting *Chang An–Lo*, 851 F.2d at 554). Thus, " '[i]f "*any* rational trier of fact could have found the essential elements of the crime," the conviction must stand.' " *Id.* (quoting *Badalamenti*, 794 F.2d at 828 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in *Jackson* ))).

Further, "[s]ince 'conspiracy by its very nature is a secretive operation,' the elements of a conspiracy may be established through circumstantial evidence." *Chang An–Lo*, 851 F.2d at 554 (quoting *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir.), *cert. denied,* 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980)). "The government's proof of an agreement 'does not

require evidence of a formal or express agreement; it is enough that the parties have a tacit understanding to carry out the prohibited conduct.'" *United States v. Rubin,* 844 F.2d 979, 984 (2d Cir.1988) (quoting *United States v. Wardy,* 777 F.2d 101, 107 (2d Cir.1985), *cert. denied,* 475 U.S. 1053, 106 S.Ct. 1280, 89 L.Ed.2d 587 (1986)). Finally, " '[o]nce a conspiracy is shown to exist, the "evidence sufficient to link another defendant to it need not be overwhelming." ' " *United States v. Tutino,* 883 F.2d 1125, 1129 (2d Cir.1989) (quoting *United States v. Ciambrone,* 787 F.2d 799, 806 (2d Cir.) (quoting *Provenzano,* 615 F.2d at 45), *cert. denied,* 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986)), *cert. denied,* 493 U.S. 1081, 1082, 110 S.Ct. 1139, 1139, 107 L.Ed.2d 1044, 1044 (1990).

■ Viewed in light of these standards, the evidence sufficiently linked Delgado to the heroin conspiracy. Gautier testified that Delgado was a worker and later the main assistant to Cruz at the 156th St./Courtlandt Ave. spot. Johnson testified that he was introduced to Delgado at the Christmas party as one of the people running the 156th St./Courtlandt Ave. spot. Photographs from the Christmas party show Delgado and Cruz sitting together at the 156th St./Courtlandt Ave. table. Police officers testified regarding three separate occasions, on September 5, 1988, October 25, 1988, and January 5, 1989, on which Delgado was arrested in connection with heroin transactions near 156th Street and Courtlandt Avenue. The arresting officer on October 25, 1988 testified that the heroin seized on that occasion was contained in glassine envelopes bearing the "Obsession" logo. In sum, the evidence easily sufficed to support the jury's verdict as to Delgado.

Delgado also argues that the government improperly changed the theory of its case against him, first contending that he was a "manager" of East 156th St./Courtlandt Ave., but "on rebuttal" changing its position and arguing "that it was not necessary to prove that [Delgado] was a manager and that proof of any involvement was sufficient" to convict him.

The indictment alleged that Delgado "worked at the store located in the vicinity of 156th Street and Courtlandt Avenue." In its opening statement, the government portrayed Cruz as the spot's "manager," and Delgado as the spot's "street manager[,] ... in charge in Anthony Cruz's absence."

In its main summation, the government explained participation in a conspiracy as follows:

> [A] person's role in the conspiracy doesn't matter. The question is whether or not you were on the team, not whether you are a starter or a star. If someone joins a conspiracy, if they are a minor ... player or a major player it doesn't matter, you are in or you are out. It's just like a roster for a baseball team, you are on the list or you are not....

The government emphasized this point specifically with respect to Delgado, stating that "you don't have to make a fortune, you don't have to have fancy cars, if you join the team you are responsible." The government similarly explained conspiracy liability in its rebuttal summation.

At the same time that he made the quoted reference to Delgado, however, the prosecutor also referred to Delgado as "more the street manager than the owner," consistent with the government's opening statement. In its rebuttal summation, as well, the government asserted "that the proof shows that ... Delgado was a street manager." Accordingly, we need not address the legal criteria that might apply if the government had changed the theory of its case against Delgado in the course of the trial, because no such change occurred.

**D. *Sentencing Issues.***

Several defendants-appellants contend that the sentences imposed upon them were improper. Before turning to their specific claims, we note several generally applicable principles. It is settled that "disputed sentencing factors need only be proved by a preponderance of the evidence." *United States v. Rodriguez–Gonzalez,* 899 F.2d 177, 182 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 127, 112 L.Ed.2d 95 (1990);

see also *United States v. Guerra,* 888 F.2d 247, 251 (2d Cir.1989), *cert. denied,* 494 U.S. 1090, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990). In reviewing a sentence imposed under the Sentencing Guidelines, we must "accept the findings of fact of the district court unless they are clearly erroneous and ... give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e) (1988). Thus, "[w]e will not overturn the [district] court's application of the Guidelines to the facts before it unless we conclude that there has been an abuse of discretion." *United States v. Santiago,* 906 F.2d 867, 871 (2d Cir.1990); *see also United States v. Perrone,* 936 F.2d 1403, 1416 (2d Cir.), *clarified on reh'g,* 949 F.2d 36 (1991); *United States v. Ibanez,* 924 F.2d 427, 430 (2d Cir.1991); *Parker,* 903 F.2d at 103; *United States v. Shoulberg,* 895 F.2d 882, 884 (2d Cir.1990).

### 1. Computation of Base Offense Level of Cruz and Delgado.

The presentence reports of Cruz and Delgado calculated their base offense levels at 36, corresponding to distribution of ten kilograms or more of heroin under the then-applicable guideline. Cruz and Delgado argue that the evidence does not support holding them responsible for this amount.

U.S.S.G. § 1B1.3(a)(2) provides that in determining the appropriate base offense level for offenses as to which U.S.S.G. § 3D1.2(d) would require grouping of multiple counts such as drug offenses, a court should consider all "[r]elevant [c]onduct," that is, "all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction." Thus, the base offense level for drug offenses "is to be calculated after taking into account the entire quantity involved in the defendant's demonstrated narcotics activity rather than a smaller amount for which the defendant has been charged and convicted." *United States v. Schaper,* 903 F.2d 891, 898 (2d Cir.1990); *see also United States v. Cousineau,* 929 F.2d 64, 67 (2d Cir.1991).

In addition, relevant conduct in the context of criminal activity undertaken in concert with others, such as a narcotics conspiracy, "includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant." U.S.S.G. § 1B1.3, comment. (n. 1); *see United States v. Joyner,* 924 F.2d 454, 457–59 (2d Cir.1991) (defendant responsible for "reasonably foreseeable acts undertaken in furtherance of any jointly undertaken activity," including drugs in possession of codefendant); *cf. Perrone,* 936 F.2d at 1416–17 (defendant not responsible for full amount of cocaine that could have been manufactured from drug-processing chemicals in his possession, when no showing of what defendant actually knew or reasonably could have foreseen in that regard).

█ Relevant conduct for sentencing need only be established by a preponderance of the evidence, *Guerra,* 888 F.2d at 251, and a trial court's determination that certain conduct is relevant will not be overturned unless clearly erroneous. *United States v. Vazzano,* 906 F.2d 879, 883 (2d Cir.1990); *see also Cousineau,* 929 F.2d at 67.

▪█ The evidence at trial showed that Cruz and Delgado were workers at the 156th St./Courtlandt Ave. spot for two months in the summer of 1988, and then ran the spot from late 1988 until Rivera's arrest on May 1, 1989. Drug records seized during the searches on May 1, 1989 show that over $375,000 worth of heroin was sent to the spot in the summer of 1988, $200,000 worth in late 1988, and $265,000 worth during 1989. During the time Cruz and Delgado were members of the Rivera organization, they attended several organization-wide social events hosted by Rivera, including (in the case of Cruz) a fall 1988 party at a restaurant and dance club and (in the case of both Cruz and Delgado) the Christmas 1988 yacht party.

The government calculated that the Rivera organization distributed approximately twenty-eight kilograms of heroin in 1989 alone. The government argued that Cruz and Delgado knew about the other "Obses-

sion" spots through their attendance at the social events and their general knowledge regarding the Rivera operation, and thus knew that they were members of an organization which distributed over ten kilograms of heroin. At sentencing, the judge held that Cruz and Delgado either knew or reasonably should have known that the organization distributed over ten kilograms during their participation in its affairs.

Cruz and Delgado contend that they had no knowledge of any other "Obsession" sales, and Cruz points out that many people other than drug dealers were present at the social events. This is true, but many coconspirators were also present. Rivera paid for the parties and gave out elaborate gifts to many in attendance. In addition, Cruz and Delgado knew or should have known of the extent of the Rivera operation because of the professionally packaged nature of the heroin sold, the percentage basis on which they sold it, and the central management team to which they reported. Taking all these factors into account, we conclude that the district court's determination that Cruz and Delgado were responsible for ten kilograms or more of heroin was not clearly erroneous.

### 2. Other Aspects of Cruz' Sentence.

The district court increased Cruz' base offense level by two levels for his managerial role at the 156th St./Courtlandt Ave. spot pursuant to U.S.S.G. § 3B1.1(c), and by two levels for willful obstruction of justice pursuant to U.S.S.G. § 3C1.1. The court also sentenced Cruz at the top of the resulting range of 292 to 365 months. Cruz challenges all these rulings.

As to the enhancement for a managerial role, Cruz stresses that he never received a gold belt buckle with his name inscribed in diamonds, or any of the other expensive gifts that Rivera lavished upon his managers. He also points to testimony that Johnson met Cruz only at the 1988 Christmas party, that Helbock and other agents testified that they never saw Cruz during surveillances that they conducted of the 156th St./Cortlandt Ave. spot, and to various other asserted inadequacies in the government's proof concerning his role in the conspiracy.

Under U.S.S.G. § 3B1.1(c), the sentencing court is required to increase the base offense level by two levels "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity." The court's determination as to the defendant's role is a question of fact subject to the clearly erroneous standard. *United States v. Jacobo,* 934 F.2d 411, 418 (2d Cir.1991); *see also United States v. Beaulieau,* 959 F.2d 375, 380 (2d Cir.1992); *United States v. Rios,* 893 F.2d 479, 481 (2d Cir.1990).

Gautier repeatedly testified that Cruz was in charge of the spot at 156th Street and Courtlandt Avenue, and mobile telephone records in evidence at trial reflected approximately sixty telephone calls from Gautier, who was in charge of the distribution of heroin and collection of sale proceeds, to Cruz. Johnson testified that Cruz was introduced to him at the 1988 Christmas party as one of the people running the 156th St./Courtlandt Ave. spot. An abbreviation of Cruz' name ("ANT") was found in Rivera's handwritten drug records. In sum, the record amply supports the district court's resolution of this issue.

We turn to Cruz' challenge to the district court's ruling that he obstructed justice. The governing provision is U.S.S.G. § 3C1.1, which calls for a two-level enhancement if the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." This provision applies to a defendant who is "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1, comment. (n. 3(a)).

The sentencing court's findings of fact regarding the obstruction of justice enhancement are subject to the clearly erroneous standard, while its ruling that the established facts constitute obstruction of

justice, which involves legal interpretation of a Guidelines term, is reviewed *de novo*, with due deference to the sentencing court. *Shoulberg*, 895 F.2d at 884 (citing § 3472(e)); *see also United States v. Stroud*, 893 F.2d 504, 507 (2d Cir.1990). "Thus, the sentencing court's findings as to what acts were performed, what was said, what the speaker meant by his words, and how a listener would reasonably interpret those words will be upheld unless they are clearly erroneous." *Shoulberg*, 895 F.2d at 884 (citing *Stroud*, 893 F.2d at 506–07).

■ To apply the obstruction of justice enhancement, however, the sentencing court must find that the defendant had the specific intent to obstruct justice, i.e., that the defendant "consciously act[ed] with the *purpose* of obstructing justice." *Stroud*, 893 F.2d at 507; *see also United States v. Thomas–Hamilton*, 907 F.2d 282, 285–86 (2d Cir.1990). The court is entitled to "draw all reasonable inferences from the words used and from the pertinent circumstances." *Shoulberg*, 895 F.2d at 885.

■ Cruz' sentence enhancement was based on codefendant Albert Delmoral's testimony that Cruz punched him during a street encounter on November 4, 1989, shortly after Cruz was arrested in this case and released on bail, inflicting an injury that required fifteen stitches. According to Delmoral, during the assault Cruz said that he knew Delmoral was "ratting out on him," and warned "[d]on't come around [Courtlandt Avenue] because I'm going to kick your ass, and you're a snitch." Cruz argues that his altercation with Delmoral does not establish that he intended to obstruct justice, since there was no proof that he intended to dissuade Delmoral from cooperating with the government.

The sentencing court credited Delmoral's testimony as to the altercation with Cruz. It held that the government had established the incident and surrounding facts by a preponderance of the evidence. The

court implicitly found that Delmoral interpreted Cruz' actions as a threat, that Cruz intended to intimidate Delmoral, and that Cruz had the requisite specific intent "to obstruct or impede the administration of justice" or attempt to do so under U.S.S.G. § 3C1.1. These findings are supported by the evidence and reasonable inferences therefrom; the court was clearly justified in enhancing Cruz' sentence for obstruction of justice in connection with his attack on Delmoral.

■ As a result of the above determinations, Cruz' sentencing range was 292–365 months. The district court sentenced him to 365 months, the top of the range. Because Cruz' sentence exceeded twenty-four months, 18 U.S.C. § 3553(c)(1) (1988) required the court to state its "reason for imposing a sentence at a particular point within the [Guidelines] range." *See United States v. Lopez*, 937 F.2d 716, 725 (2d Cir.1991) ("statements made at the time of sentencing must demonstrate that the district judge 'thoughtfully discharged his statutory obligation, with a degree of care appropriate to the severity of the punishment ultimately selected' ") (quoting *United States v. Chartier*, 933 F.2d 111, 117 (2d Cir.1991)).

Cruz argues that the district court did not adequately state the reasons for his sentence. On the contrary, however, the court stated:

> While under the circumstances the criminal history level of 1 is indicated, since there has not been a sentencing[,[3]] I do have a question regarding the adequacy of this category because certainly the information here indicates that the category does not adequately reflect the seriousness of this defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, and those are factors that I may consider in imposing a sentence.

**3.** At the time of his sentencing in this case, Cruz was awaiting sentencing in state court for a manslaughter to which he had pled guilty. The killing occurred after Cruz was arrested in this case and released on bail. He was initially charged with murder in the second degree, but pled guilty to manslaughter on the understanding that he would be sentenced to a prison term of 8⅓ to 25 years, to be served concurrently with his federal sentence in this case.

I feel this is a very violent and very dangerous young man. I think the testimony we have had in this case indicates it. His general course of conduct certainly does indicate it as well.

The court then added "I sentenced [Cruz] to the top of the range for the reasons I indicated." The court's statement met the requirements of § 3553(c)(1).

### 3. Briggs' $17,500 Fine.

Briggs pled guilty to the narcotics conspiracy in count one. The court sentenced him to 188 months imprisonment, five years supervised release, a $17,500 fine, and a $50 special assessment.

Under the Guidelines, "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). In determining the amount of the fine, the sentencing court is directed to consider "any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources." *Id.* § 5E1.2(d)(2). Waiver of the normally required fine is governed by U.S.S.G. § 5E1.2(f), which provides in part:

If the defendant establishes that (1) he is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay all or part of the fine required by the preceding provisions, or (2) imposition of a fine would unduly burden the defendant's dependents, the court may impose a lesser fine or waive the fine.

 A defendant seeking to avoid a Guidelines fine on the basis of inability to pay must come forward with evidence of that financial inability. *United States v. Marquez,* 941 F.2d 60, 65–66 (2d Cir.1991). The defendant can satisfy this burden by an independent showing, or by reference to his presentence report. *See United States v. Labat,* 915 F.2d 603, 606 (10th Cir.1990). If the defendant is indigent, a fine should not be imposed absent evidence in the record that he will have the earning capacity to pay the fine after release from prison.

*United States v. Seminole,* 882 F.2d 441, 443 (9th Cir.1989).

 Briggs' presentence report indicated a Guidelines fine range of $17,500–$175,000, with a maximum statutory fine of $4 million. The report went on to say, however, that "defendant owns no assets at the current time ... [and] has no income or expenses." It added that "[w]ith no cash flow and a total net worth of zero, this defendant does not appear to have the ability to pay a fine."

At sentencing, the court imposed upon Briggs "[a] fine as recommended of $17,-500." When Briggs' attorney asserted that the presentence report did not contain a recommendation of a fine, the court responded that "[t]here is a recommendation of a fine." After the attorney pointed out Briggs' indigence, the court responded:

He's not going to be asked to pay that fine today. He's a young person. He will eventually be working, hopefully, and this will be under the supervision of the probation department at that time.

On the whole, we do not believe that Briggs' presentence report should be read as recommending a fine in view of its conclusion that Briggs did not "appear to have the ability to pay a fine." If the fine was imposed in reliance upon a contrary reading of Briggs' presentence report, the court abused its discretion. *See United States v. Washington–Williams,* 945 F.2d 325, 328 (10th Cir.1991) ("To the extent that the fine rests upon a clearly erroneous material fact, the fine would constitute an abuse of discretion."). In view of the confused state of the record on this issue, the course of prudence is to vacate Briggs' sentence and remand for reconsideration of his sentence with respect to the $17,500 fine imposed upon him.

### 4. The Sentences of Simmons and Rodriguez.

Simmons and Rodriguez appeal the sentences imposed after their guilty pleas. Simmons claims that he should have received a downward departure in his criminal history category under the Sentencing Guidelines. Rodriguez contends that she

should have received a downward departure based on her cooperation with the government, notwithstanding the government's failure to make a motion for such departure under 18 U.S.C. § 3553(e) (1988) or U.S.S.G. § 5K1.1, p.s.

 Both Simmons and Rodriguez entered into plea agreements with the government that stated:

> The parties further agree that should the Court sentence [the defendant] on the lesser offense included in Count One [the narcotics conspiracy], as specified above, within the range set forth in the third paragraph of this Agreement, neither the Government nor the defendant will file a notice of appeal in the district court for review of the sentence imposed on that offense.

Both of their sentences on the narcotics conspiracy count were within the agreed range. Thus, they have waived their right to appeal the sentences imposed with respect to that offense.

 Simmons and Rodriguez were also each given a consecutive sixty-month sentence on their firearms convictions, which is the mandatory minimum sentence required by statute. See 18 U.S.C. § 924(c)(1) (1988 & Supp. II 1990). Simmons' argument for a downward departure in his criminal history category would have no effect upon this mandatory minimum, and the court's refusal to depart downward is not appealable in any event. See 18 U.S.C. § 3742(a) (1988) (providing four categories in which appeal by defendant allowed, refusal to depart downward not included); United States v. Colon, 884 F.2d 1550, 1552–56 (2d Cir.) (foreclosing appellate review of court's decision not to depart downward), cert. denied, 493 U.S. 998, 110 S.Ct. 553, 107 L.Ed.2d 550 (1989).

 Rodriguez' argument for a downward departure from the mandatory minimum, notwithstanding the government's refusal to make the required motion, is also foreclosed in the absence of a credible assertion that the government refused to make the motion because of an unconstitutional motive. See Wade v. United States, — U.S. —, — – —, 112 S.Ct. 1840,

1843–44, 118 L.Ed.2d 524 (1992); cf. United States v. Rexach, 896 F.2d 710, 713–14 (2d Cir.) (when, unlike this case, plea agreement includes provision specifically addressing motion to reduce sentence, prosecutor's conduct reviewable on issue of good faith performance of contractual obligation), cert. denied, — U.S. —, 111 S.Ct. 433, 112 L.Ed.2d 417 (1990).

We conclude that there is no basis for reversal of the sentences of Simmons and Rodriguez.

### Conclusion

The judgments of conviction are affirmed, except that the sentence of Victor Briggs is vacated and remanded for reconsideration with respect to the $17,500 fine imposed upon him.