**UNITED STATES of America, Appellee,**

v.

**Edgar VARGAS, Nidia Campos, and Mario Campos, Defendants–Appellants.**

Nos. 385, 572, 573, Docket 92–1094, 92–1252, 92–1258.

United States Court of Appeals, Second Circuit.

Argued Nov. 13, 1992.

Decided Feb. 19, 1993.

Linda B. Lakhdhir, Asst. U.S. Atty., Brooklyn, NY (Andrew J. Maloney, U.S.

Atty. for E.D.N.Y., Susan Corkery, Asst. U.S. Atty., Brooklyn, NY, on the brief), for appellee.

Thomas H. Nooter, New York City (Freeman, Nooter & Ginsberg, New York City, on the brief), for defendant-appellant Vargas.

Martin L. Schmukler, New York City (Roger J. Schwarz, New York City, on the brief), for defendant-appellant Nidia Campos.

Domenick J. Porco, New York City (Barry Asness, New York City, on the brief), for defendant-appellant Mario Campos.

Before: NEWMAN, KEARSE, and CARDAMONE, Circuit Judges.

KEARSE, Circuit Judge:

Defendants Edgar Vargas, Nidia Campos, and Mario Campos appeal from final judgments of the United States District Court for the Eastern District of New York convicting them, following a jury trial before Carol Bagley Amon, *Judge*, of narcotics-related and money-laundering offenses. All three defendants were convicted of conspiring to conduct a financial transaction involving the proceeds of narcotics trafficking activity, in violation of 18 U.S.C. §§ 371 and 1956(a)(1)(B)(i) (1988). In addition, Vargas was convicted of possessing and conspiring to possess cocaine with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (1988); and Mario Campos was convicted of conspiring to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846, and of using a communication facility to facilitate the commission of a narcotics trafficking offense, in violation of 21 U.S.C. § 843(b) (1988). Vargas was sentenced principally to a total of 188 months' imprisonment, to be followed by a total of five years of supervised release. Nidia Campos was sentenced principally to 54 months' imprisonment, to be followed by three years of supervised release. Mario Campos was sentenced principally to a total of 120 months' imprisonment, to be followed by a total of five years of supervised release. On appeal, Vargas challenges the calculation of his sentence under the federal Sentencing Guidelines ("Guidelines"); the other defendants contend chiefly that the evidence was insufficient to support their convictions. For the reasons below, we conclude that their contentions are without merit.

## I. BACKGROUND

The events at issue here, all of which took place in 1989, were the subject of two trials. The government's evidence was presented principally through the testimony of Drug Enforcement Administration ("DEA") agents, recorded conversations, and telephone records. Taken in the light most favorable to the government, the evidence at the first trial was as follows.

On June 9, while acting in an undercover capacity, DEA Special Agent Robert Matos was introduced to Vargas, who said he was interested in buying 25 kilograms of cocaine at a price of $12,000 per kilo. Matos responded that he had no cocaine at the moment but that he imported 500 kilograms of cocaine every 1½ months; he also said that he did not sell in lots of less than 50 kilograms. Vargas agreed to purchase 50 kilos, with prospects for more in the future.

Vargas and Matos also discussed money laundering. Vargas described one of his associates as a Hispanic man who owned a bar and who could exchange small-denomination bills for $100 bills for ease of transport and concealment. Matos said he wanted to send his money to Spain, and Vargas said he had another associate, a woman, who could launder money by sending it to foreign countries. He told Matos that the male associate's fee for changing small bills into large ones was 7% and that Matos would have to meet the female associate and discuss what percentage she would charge for sending money abroad. Vargas said that his associates could launder as much money as Matos wished and that he would speak to them about the cocaine and the money laundering.

On June 20, Vargas told Matos that Vargas's associates wanted to buy all 500 kilograms of Matos's imminent cocaine shipment. However, they wanted to pay for

half of it on delivery and for the other half 15–20 days after delivery. Matos responded that since this would be the first time he had dealt with Vargas, he would require payment in full on delivery. Vargas said he would speak again with his associates. Vargas also said he wanted to introduce Matos to his male associate the next day, and that Matos "could speak to him about the five hundred kilos of cocaine and speak to him about laundering the money, sending money to Spain, and find out the percentage they were going to charge."

On the evening of June 21, Vargas took Matos to a bar in Queens, New York, and introduced him to Mario Campos ("Mario"). Mario said Vargas had told him that Matos had a large amount of money to be laundered. Mario said he could change a half-million dollars from small bills to $100 bills; he confirmed that his fee would be 7% of the amount changed. He said he routinely changed $400,000 a week for Vargas. Matos told Mario that he did not want the money changed into larger bills but rather wanted it sent to another country. Mario said that the person who performed that service was his wife.

Mario said Vargas had also told him that Matos imported cocaine, and he asked how much Matos could bring in. When Matos responded that he brought in 500 kilograms every 1½ months, Mario suggested that Matos speak to Mario's wife, stating that she was "tapped out" of cocaine and was interested in purchasing large quantities. Mario said he would call his wife and tell her that Matos wanted to speak with her. Mario then went to the other side of the bar; when he returned he said he had spoken to his wife, Nidia, and that Matos and Vargas should go speak with her.

Matos and Vargas promptly left the bar and drove to the offices of Costa Rica Realty, where they met privately with Nidia Campos ("Nidia"). Nidia said Vargas had told her that Matos was a smuggler of large quantities of cocaine and needed her services to launder the proceeds of his drug sales. She asked how much money he needed laundered and said she could provide a variety of services, including setting up fictitious companies to provide a front for his profits, purchasing houses with documentation falsified to hide his ownership, and transferring money to foreign countries. For the last service, Nidia said the fee would be 10% of the cash transferred. Matos responded that he wanted to have his money transferred to Spain but that 10% was too high. Nidia promptly called another of her associates to arrange to discuss later whether the percentage could be lowered.

Nidia also asked Matos how much cocaine he could import; when told 500 kilos every month or month and a half, she inquired as to the price. Matos quoted her a price of $10,000 per kilo for 500 kilos, or a total of $5 million. Nidia responded that that was a good price and that she was interested in making the purchase. She said Vargas would be the intermediary between herself and Matos, relaying information with regard to the money laundering and the cocaine purchase. She would have Vargas let Matos know whether she would be able to lower the 10% fee for transferring money. As the two men left the realty office, Vargas told Matos that Nidia could purchase the 500 kilos easily.

On July 6, Vargas advised Matos that he had spoken to Nidia and that she could not lower the 10% money-transfer fee. Vargas also said that Nidia wanted to buy the 500 kilos of cocaine but had only $3 million. Vargas suggested that Matos deliver the 500 kilos, receive the $3 million immediately, and receive the remaining $2 million within 15 days. Matos declined to accept less than full payment on delivery.

In late July, Vargas reported that he had two buyers who would be dividing the 500 kilos of cocaine. He also said that if the second buyer backed out, Nidia would take the entire amount. In arranging for delivery, Vargas said that one of Nidia's associates would examine the shipment to verify its purity; he also asked that the cocaine be delivered in a vehicle Vargas could use to take it to the two buyers. Vargas tried again, still unsuccessfully, to persuade Matos to accept less than the full purchase price on delivery, this time telling him that

Nidia was often fronted large amounts of cocaine by the Cali cartel in Colombia. A few days later, Vargas advised Matos that the second buyer had withdrawn but that Nidia would purchase all of the cocaine. Later that day, Matos met Vargas and showed him a van containing 500 kilograms of cocaine. Vargas examined it, declared it satisfactory, and went to see Nidia. He reported back, however, that Nidia now wanted the entire shipment on consignment. He explained that Nidia's associate had negotiated the purchase of 1,000 kilograms of cocaine from another source and that Nidia needed her cash as security for that transaction. Matos refused to deliver the cocaine without receiving payment. On the following day, Matos spoke with both Nidia and her associate, "Hector," who tried to persuade Matos to deliver the cocaine and keep Hector or Vargas as a hostage until payment was received. Matos declined.

In the days that followed, Vargas tried to reach Matos, who refused to return his calls. The two next met on August 7, and Matos said that he had only 300 kilograms of cocaine left. Vargas said that Nidia would purchase 25 kilos every three days until Matos's supply was exhausted; Vargas said his second buyer also wanted 25 kilos at the time of Nidia's first purchase. Thus, Vargas would take 50 kilos in the first delivery, for which he would bring $500,000.

On August 9, Vargas met Matos and gave him bags containing a total of approximately $295,000. Matos directed Vargas to a car in which one kilogram of cocaine had been placed, telling Vargas that it contained the 50 kilos. After Vargas took the keys, entered the car, and put the keys in the ignition, he was arrested.

Vargas, Nidia, and Mario were charged with conspiring to launder the proceeds of narcotics trafficking activity, in violation of 18 U.S.C. §§ 371 and 1956(a)(1)(B)(i), and with conspiring to possess cocaine with intent to distribute it, in violation of 21 U.S.C. § 846. In addition, Vargas was charged with possessing cocaine with intent to distribute it, in violation of 21

U.S.C. § 841(a)(1); and Mario Campos was charged with using a communication facility to facilitate the commission of a narcotics trafficking offense, in violation of 21 U.S.C. § 843(b). At the first trial, Vargas and Mario were convicted on all of the counts with which they were charged; the jury was unable to reach a verdict as to Nidia. Thereafter, Nidia was retried, with the government presenting, *inter alia*, all of the above evidence of the events involving Nidia. The jury at the retrial found Nidia guilty of the money-laundering conspiracy but not guilty of the narcotics conspiracy.

Defendants were sentenced as indicated above, and these appeals followed.

## II.  DISCUSSION

On appeal, Mario and Nidia challenge the sufficiency of the evidence to convict them. Vargas challenges the calculation of his sentence. None of their contentions has merit. Only Mario's challenge to the sufficiency of the evidence to convict him on the narcotics conspiracy count warrants extended discussion.

### A.  *Sufficiency of the Evidence To Convict Mario of Narcotics Conspiracy*

■ In order to prove a conspiracy, the government "need not present evidence of an explicit agreement; proof of a tacit understanding will suffice." *United States v. Skowronski*, 968 F.2d 242, 247 (2d Cir.1992); *see United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1191 (2d Cir.), *cert. denied*, 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989). A conviction for conspiracy must be upheld if there was evidence from which the jury could reasonably have inferred that the defendant knew of the conspiracy charged in the indictment and that he "associat[ed] himself with the venture in some fashion, 'participat[ed] in it as something that he wish[ed] to bring about,' or '[sought] by his action to make it succeed.'" *United States v. Johnson*, 513 F.2d 819, 823 (2d Cir.1975) (conspiracy conviction reversed in absence of evidence that defendant's presence in automobile, owned and operated by another to import narcot-

ics, reflected other than simply a desire to accompany friend on trip) (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)); *see, e.g., United States v. Maldonado–Rivera*, 922 F.2d 934, 963 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2858, 115 L.Ed.2d 1025 (1991); *United States v. Sanchez Solis*, 882 F.2d 693, 696 (2d Cir. 1989); *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir.1984). A defendant's knowledge of the conspiracy and his participation in it with criminal intent may be established through circumstantial evidence. *See, e.g., United States v. Skowronski*, 968 F.2d at 247; *United States v. Villegas*, 899 F.2d 1324, 1338–39 (2d Cir.), *cert. denied*, 498 U.S. 991, 111 S.Ct. 535, 112 L.Ed.2d 545 (1990); *United States v. Tutino*, 883 F.2d 1125, 1129 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990).

■ In reviewing a challenge to the sufficiency of the evidence to support a conviction, we must credit every inference that could have been drawn in the government's favor, *see, e.g., United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); *United States v. Carson*, 702 F.2d 351, 361 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983), and we must affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt, *see, e.g., United States v. Buck*, 804 F.2d 239, 242 (2d Cir.1986); *United States v. Taylor*, 464 F.2d 240, 244–45 (2d Cir.1972). The conviction must be upheld if *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

■ Mario contends that all he did was make one telephone call to Nidia and that that was insufficient to support his conviction on the narcotics conspiracy count. He relies principally on *United States v. Tyler*, 758 F.2d 66 (2d Cir.1985), and *United States v. Hysohion*, 448 F.2d 343 (2d Cir. 1971), arguing that merely helping a will-

ing buyer to make contact with a willing seller does not establish a conspiracy. Though the legal premise is sound, it does not govern the present case. In *Tyler*, we reversed the conspiracy conviction of the defendant Tyler, who had introduced an undercover police officer, Baxter, to one Bennett, who in turn sold Baxter heroin. Tyler had encountered Baxter on the street and, when advised that Baxter wanted "some good dope," sought to help him. Tyler first approached one man but eventually did not recommend buying from him "because there was a lot of dope on the street that was not good." Tyler next approached Bennett. Baxter and Bennett then moved away from Tyler and completed the transaction; when Baxter eventually turned and walked back, Tyler asked him for some change. *United States v. Tyler*, 758 F.2d at 67. We held that this evidence, which showed merely that Tyler helped a willing buyer locate a willing seller, was insufficient to prove a conspiracy between Tyler and Bennett:

> Conspicuously absent from this scenario is any evidence that Tyler asked Baxter how much heroin he sought to purchase, that Tyler indicated that he had a specific source of heroin in mind for Baxter, that Tyler knew where to find Bennett or expected him to be in the area, or that Tyler had made any previous deals with Bennett.

*Id.* at 68–69.

The evidence here, viewed in the light most favorable to the government, was substantially more probative. Vargas had described both Mario and Nidia to Matos as his "associate[s]," and on June 20 he said Matos could speak to his male associate not only about money laundering but also about the 500 kilos of cocaine. Before introducing Matos to Mario on June 21, Vargas, himself plainly a narcotics trafficker, had discussed Matos's supposed importation of cocaine with Mario. Mario, at their June 21 meeting, explored with Matos the subject of narcotics purchases, asking how much cocaine Matos could bring in and plainly having one specific buyer—Nidia—in mind. Mario knew the size of Nidia's

operation, the status of her inventory, and her immediate goals; thus, he told Matos that Nidia was "tapped out" and would be interested in purchasing a large quantity of cocaine. Mario telephoned Nidia to tell her about Matos; and he urged Matos to go see her. This evidence provided a sufficient basis for a rational juror to infer beyond a reasonable doubt that Mario was well acquainted with Nidia's narcotics operation, that he had agreed, at least implicitly, to assist in that operation, and that he took steps to do so.

### B. *Other Sufficiency Challenges*

■ Other sufficiency challenges include arguments by both Mario and Nidia that the evidence was insufficient to support their convictions for money-laundering conspiracy. These challenges are frivolous. Mario and Vargas were plainly coconspirators in a money-laundering operation. Vargas described Mario as his associate and introduced Mario to Matos in connection with the latter's professed desire to launder money. Mario confirmed Vargas's earlier representation as to Mario's fee. The evidence was ample that Vargas was a narcotics dealer, and Mario said that he regularly laundered $400,000 a week for Vargas. The evidence thus plainly showed a conspiracy at least between Mario and Vargas.

Vargas also had described Nidia as his associate. Nidia confirmed that she had discussed Matos's money-laundering needs with Vargas, and she advised Matos that Vargas would thereafter serve as her representative in dealing with Matos. Further, Nidia stated that before she could lower the fee for sending money abroad, she had to consult with another associate, whom she telephoned in Matos's presence. Finally, Mario's phone call to Nidia permitted the inference that he was referring to her the large-bill conversions that he preferred not to handle. The evidence was thus ample to show that the conspiracy included the money-laundering arrangements at least between Nidia and Vargas, and between Nidia and another. *See, e.g., United States v. LoRusso,* 695 F.2d 45, 56 n. 8 (2d Cir.1982) (defendant's own statement referring to "his people" provided evidence that he had entered into agreements with others), *cert. denied,* 460 U.S. 1070, 103 S.Ct. 1525, 75 L.Ed.2d 948 (1983).

### C. *Vargas's Challenges to his Sentence*

Vargas contends that the sentencing court erred in calculating his offense level under the Guidelines. He contends principally that the court (a) should have found that he was incapable of purchasing as much as 50 kilograms of cocaine, and (b) should not have increased his offense level for obstruction of justice. His contentions are meritless.

■ Vargas argues that because he delivered only $295,000 for the transaction on August 9, the sentencing court, in light of the $10,000 per kilogram price, should have found that he was not capable of purchasing as much as 50 kilograms of cocaine, which would have cost $500,000. We reject this contention in light of the ample evidence of the ability of Vargas and his associates to purchase 50 kilograms or more. The record included evidence that when Vargas and Matos first met, Vargas showed him records of a 60–kilogram purchase Vargas had recently made. Further, Vargas consistently represented that his associates had at least $3 million available for the purchase of cocaine, and he repeatedly attempted to persuade Matos to sell 500 kilograms partially on consignment, promising to pay for at least half of that amount on delivery. In addition, following his arrest, Vargas told the agents that $5 million would have been forthcoming within 20 days for 500 kilos of cocaine. The district court's finding that Vargas was capable of purchasing 50 or more kilograms of cocaine was not clearly erroneous.

■ Vargas's challenge to the two-level increase in his offense level under § 3C1.1 of the Guidelines for willful obstruction of justice, on the ground that his obstructive acts were not willful, has no greater merit. It is established that in order to enhance a defendant's sentence under Guidelines § 3C1.1, the sentencing court must find

that "the defendant consciously act[ed] with the *purpose* of obstructing justice." *United States v. Stroud,* 893 F.2d 504, 507 (2d Cir.1990) (emphasis in original); *see also United States v. Bonds,* 933 F.2d 152, 154 (2d Cir.1991) (per curiam); *United States v. Thomas–Hamilton,* 907 F.2d 282, 285 (2d Cir.1990); *United States v. Altman,* 901 F.2d 1161, 1164 (2d Cir.1990). And we have ruled that mere flight from an arresting officer to avoid capture in the immediate aftermath of a crime does not of itself constitute an obstruction of justice within the meaning of that provision. *United States v. Stroud,* 893 F.2d at 508.

Vargas, however, did not merely flee to avoid capture in the immediate aftermath of the crime. He had already been apprehended and had agreed to cooperate in a controlled delivery to his second buyer. When the buyer appeared, Vargas yelled something, leapt over the hood of the surveilling agents' car, and attempted to escape. When one of the agents caught him and pinned him to the ground, he grabbed the agent's gun. Though Vargas claims that his actions were prompted by fear, the court's finding that Vargas grabbed the officer's gun with the intent to obstruct justice was not clearly erroneous.

## CONCLUSION

We have considered all of defendants' arguments on these appeals and have found them to be without merit. The judgments of conviction are affirmed.