35 F.3d 699
 UNITED STATES of America, Appellee,
v.
David PODLOG; Alexander Moysif; Yelena Moysif; Joseph
Forzano; Lyudmila Forzano; Michael Cardone; Ronald
Petrino; Gennady Chernyakhovsky; Adolf Sirotnikov; Aron
Roizis; Yefim Kats; Yura Popov, Defendants,
Calogero Badalamenti; John Romano; Giuseppe Genna; and
Sergey Mogorichev, also known as "Sergio", also
known as "Seryi", Defendants-Appellants.
 Nos. 1506, 1557, 1612 and 1652, Dockets 93-1734, 93-1775,
93-1776 and 93-1777.
 United States Court of Appeals,
Second Circuit.
 Argued May 16, 1994*.
Decided Sept. 13, 1994.
 
 Michael H. Sporn, New York City, for defendant-appellant John Romano.
 David A. Lewis, New York City (The Legal Aid Society, Federal Defender Div., Appeals Bureau, New York City, of counsel), for defendant-appellant Giuseppe Genna.
 Gary S. Villanueva, New York City, for defendant-appellant Sergey Mogorichev.
 William Lupo, Brooklyn, NY (Leighton M. Jackson, Brooklyn, NY, of counsel), for defendant-appellant Calogero Badalamenti.
 Robert E. Rice, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty. S.D. N.Y., John W. Auchincloss II, Asst. U.S. Atty., New York City, of counsel), for appellee U.S.
 Before: OAKES and MINER, Circuit Judges, and CARTER, District Judge.**
 MINER, Circuit Judge:
 
 
 1
 Appellants Calogero Badalamenti, John Romano, Giuseppe Genna and Sergey Mogorichev appeal from judgments of conviction and sentence entered on October 21, 1993 (Badalamenti and Mogorichev), November 1, 1993 (Genna) and November 22, 1993 (Romano) in the United States District Court for the Southern District of New York (Keenan, J.), following a jury trial, for conspiring to distribute and possess with intent to distribute heroin, in violation of 21 U.S.C. Sec. 846. The district court sentenced Badalamenti to a 135-month term of imprisonment, to be followed by a five-year term of supervised release. Romano received a sentence of seventy-eight months in prison, to be followed by a five-year term of supervised release, while Mogorichev was sentenced to a sixty-three month term of imprisonment, to be followed by a five-year term of supervised release. The district court sentenced Genna to a 120-month term of imprisonment, to be followed by a five-year term of supervised release.
 
 
 2
 For the reasons that follow we vacate the sentence imposed upon Genna by the district court, remand for Genna's resentencing and affirm the judgments in all other respects.
 
 BACKGROUND
 
 3
 In 1991, defendant Yossif Roizis organized a scheme to smuggle heroin into the United States from Poland. In March of that year, Roizis met with defendant Alex Moysif and told him that defendant David Podlog would pay Moysif $10,000 to smuggle two kilograms of heroin from Warsaw, Poland into the United States. Later that month, Moysif made two trips to Poland and successfully smuggled approximately two kilograms of heroin into the United States at the conclusion of each trip.
 
 
 4
 In April of 1991, Moysif and defendant Yefim Kats began to sell heroin in New York City. On April 15, 1991, an informant ("CI"), in the presence of DEA Special Agent Louis Cardinali, contacted Kats and arranged to purchase 230 grams of heroin for $43,700 on the following day. On April 16, Moysif and Kats sold the heroin to the CI and Agent Cardinali, who was posing as the CI's partner. Later that day, Moysif paid Roizis $25,000 for the heroin.
 
 
 5
 In the weeks following the April 16 sale, Moysif provided several samples of heroin to Agent Cardinali and the CI. On June 10, 1991, while providing Agent Cardinali with one of these samples, Moysif and Agent Cardinali discussed a possible future purchase of 125 grams of heroin. On June 28, 1991, Agent Cardinali contacted Moysif and inquired further about purchasing 125 grams. The transaction was not consummated until July 3, when Agent Cardinali paid $22,500 to Moysif and Kats for the agreed upon amount of 125 grams. Moysif had obtained the heroin from Podlog in exchange for $16,500.
 
 
 6
 Also during the summer of 1991, Moysif asked defendant Joseph Forzano whether he knew of anyone who was interested in buying heroin. Forzano told Moysif to contact defendant-appellant Calogero Badalamenti, who ran the Caffe Venezia in Brooklyn, New York. In early August of 1991, after receiving several samples of heroin from Moysif, Badalamenti purchased one ounce of heroin for $5,000. Badalamenti also introduced Moysif to defendant-appellant "Joe" Genna and told him that Genna could help him sell heroin. Moysif provided heroin samples to Genna.
 
 
 7
 On August 14, 1991, Moysif contacted Podlog and told him that he might need to obtain one-half kilogram of heroin. Podlog informed Moysif that it would cost $50,000 and instructed him to phone and ask for a "catalog" when he needed the heroin. Badalamenti and Genna met Moysif that evening at the Caffe Venezia and ordered one-half kilogram of heroin. Moysif informed them that the heroin would cost $70,000. The next morning, Moysif contacted Podlog and requested a "catalog." Later that morning, Podlog gave Moysif the heroin and Moysif told him that he would pay him at a later time. Moysif immediately went to the Caffe Venezia where he met Badalamenti, who took the heroin and told Moysif that he would contact him as soon as he got the money. Later that day, Badalamenti gave a sample of the heroin to Genna. At about 8:00 p.m., Badalamenti informed Moysif that Genna had not gotten back to him about the heroin, but that he was certain that Genna would buy it. Moysif told Badalamenti that Podlog was pressuring him for the money for the heroin. Later that evening, Badalamenti and Genna told Moysif that they knew someone in Queens who would buy the heroin.
 
 
 8
 The following day, August 16, Badalamenti and Genna drove to an auto-body shop owned by defendant-appellant John Romano, the "someone" referred to by Badalamenti and Genna. Moysif followed in a separate car. Romano told Moysif that he wanted someone to test the heroin and he would then return with the money for the heroin. While Moysif and the others waited, Romano left to make several telephone calls, returning each time to tell Moysif that the customer was not ready yet. After waiting a while longer, Genna, who had been talking with Romano, informed Moysif that Romano had called off the deal. Moysif then took the one-half kilogram and returned to Brooklyn. Later that day, Moysif gave the heroin to Badalamenti and told him he didn't care what he did with it, but that he needed to receive payment soon.
 
 
 9
 The next morning, Podlog began to pressure Moysif for the money for the one-half kilogram of heroin. Moysif assured Podlog that he would get his money. After speaking to Genna twice and receiving no definitive answers concerning whether a sale would occur, Moysif contacted Badalamenti that evening and met with him, Genna and Forzano at the Caffe Venezia. Romano also was contacted, and he reassured Moysif that he had a buyer in Long Island who would consummate the deal the following day.
 
 
 10
 On August 18, 1991, after numerous telephone calls and beeper contacts between Romano and Moysif, it became apparent that Romano's buyer was not going to consummate the deal. Moysif telephoned Podlog and left a message on his answering machine informing him of the situation. Upon hearing the message, Podlog telephoned Moysif and threatened to kill him by chopping off his head. Moysif immediately contacted Romano and threatened to "hang" Genna and "kill" Badalamenti. That evening, however, Moysif met with Badalamenti, Genna and Romano and reduced the price of the heroin from $70,000 to $50,000--$40,000 payable immediately and $10,000 due when the heroin was sold. Romano agreed to pay $20,000, and Badalamenti and Genna each agreed to pay $10,000. The next morning, Genna paid Moysif $10,000. Moysif then went to the Caffe Venezia to wait for Romano. When Romano failed to show up, Moysif and others drove to the autobody shop to collect the $20,000 from Romano. When Moysif arrived at the shop, Romano informed him that he was still trying to raise the money, but that he would have it the following day. Moysif displayed a gun to Romano and told him that he was carrying the gun because of Podlog's threats and that he needed the money soon. The next day, August 20, Romano paid Moysif $20,000 and Moysif turned this money over to Podlog.
 
 
 11
 On August 29, 1991, Agent Cardinali contacted Moysif and inquired about purchasing another 125 grams of heroin. That afternoon, Agent Cardinali and the CI met with Moysif and defendant Gennady Chernyakhovsky, at which time Agent Cardinali purchased the heroin from Moysif for $22,500.
 
 
 12
 The next day, Genna met with Moysif at the Caffe Venezia and told him that he had a potential buyer for either 125 or 400 grams of heroin. Moysif assured him that it would not be a problem and told him to let him know "when" and "how much." That evening, Genna met with Moysif and told him that he would need 125 grams of heroin the next morning. At approximately 1:00 pm on August 31, 1991, Moysif obtained 83 grams of heroin from Podlog and combined it with 42 grams he already had. Moysif then went to the Caffe Venezia where he sold the 125 grams to Genna in exchange for $17,000.
 
 
 13
 On September 2, 1991, Badalamenti told Moysif that he had a customer who wanted to buy one kilogram of heroin. Moysif contacted Podlog, who initially agreed to provide the heroin. However, when Moysif attempted to make arrangements to pick up the heroin, Podlog refused to provide it. On September 5, Moysif met with Podlog and pleaded for the heroin; Podlog eventually acquiesced. However, when Moysif arrived at the Caffe Venezia to inform Badalamenti that he had obtained the heroin, Badalamenti told him that the deal was off. When Moysif related this to Podlog, Podlog berated him and refused to do business with him again. Shortly thereafter, Moysif contacted his friend, defendant-appellant Sergey Mogorichev, who had been with Badalamenti earlier that morning, and explained what had occurred.
 
 
 14
 On September 7, 1991, Badalamenti renewed his request for the kilogram of heroin and assured Moysif that his customer now had the money. When Moysif attempted to contact Podlog to obtain the heroin, Podlog refused to speak with him. Badalamenti persisted in his requests for the heroin, but by September 14 it was apparent that Moysif would be unable to deliver it. Around this time, Moysif began to think that he was being surveilled by law enforcement agents and, shortly thereafter, fled to California.
 
 
 15
 At this time it appears that Mogorichev stepped into the breach created by Moysif's absence. Mogorichev contacted Chernyakhovsky on September 19 and told him that "[n]ext week, they'll need a shirt." Mogorichev then corrected himself and said, "[n]ot a shirt, but a sleeve." When Chernyakhovsky asked who wanted it, Mogorichev replied: "They said that it'll be next week." Mogorichev also told Chernyakhovsky that he needed a couple of "labels" from Roizis to show some people and that he would buy them if necessary. On September 25, defendant Michael Cardone called Mogorichev, told him that he knew that Moysif was out of town and asked him if they could get together to talk about "a couple of things." The two met that evening.
 
 
 16
 Later that same day, Agent Cardinali called Moysif's beeper and Mogorichev returned the call. When Cardinali told Mogorichev that he wanted to talk to Moysif about a few things, Mogorichev replied, "[y]ou can talk to me about it ... [it's the] same thing, just its me, you understand." He further informed Agent Cardinali that he was Moysif's "partner." At a meeting on September 26, Mogorichev informed Agent Cardinali that he could provide as much heroin as Cardinali required and that it was the "same thing, same people." Mogorichev also told Cardinali that he was aware that Cardinali picked up a "catalog" each month from Moysif.
 
 
 17
 On September 24, 1992, Romano, Genna, Mogorichev and Badalamenti were charged in Count One[1] of a three-count superseding indictment with conspiring to distribute and possession with intent to distribute heroin, in violation of 21 U.S.C. Sec. 846. At trial, Romano called one witness, an employee of his auto-body shop. Genna, Mogorichev and Badalamenti did not present any evidence. All four were found guilty by a jury. The district court sentenced Romano to a 78-month term of imprisonment, to be followed by a five-year term of supervised release and a $50 assessment. Genna was sentenced to a 120-month term of imprisonment, to be followed by a five-year term of supervised release and a $50 assessment, while Mogorichev received a 63-month term of imprisonment, to be followed by a four-year term of supervised release and a $50 assessment. Badalamenti was sentenced to a 135-month term of imprisonment, to be followed by a five-year term of supervised release and a $50 assessment.
 
 
 18
 The appellants currently are serving their respective sentences.
 
 DISCUSSION
 I. Coercion and Duress
 
 19
 Romano contends that the district court erred by denying his request for a jury instruction on coercion and duress. This contention is without merit. It is settled that "[a] defendant is entitled, upon proper request, to an instruction submitting to the jury any defense theory for which there is a foundation in the evidence." United States v. Bryser, 954 F.2d 79, 87 (2d Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 2939, 119 L.Ed.2d 564 (1992). This court has clearly stated the elements necessary to make out a defense of duress and coercion:
 
 
 20
 A claim of duress and coercion constitutes a legal excuse for criminal conduct when, at the time the conduct occurred, the defendant was subject to actual or threatened force of such a nature as to induce a well-founded fear of impending death or serious bodily harm from which there was no reasonable opportunity to escape other than by engaging in the otherwise unlawful activity.
 
 
 21
 United States v. Agard, 605 F.2d 665, 667 (2d Cir.1979) (emphasis added). A defendant " 'must present some evidence on all of the elements of the defense,' including the distinct 'element of lack of a reasonable opportunity to escape the threatening situation.' " United States v. Bakhtiari, 913 F.2d 1053, 1057-58 (2d Cir.1990) (quoting United States v. Patrick, 542 F.2d 381, 388 (7th Cir.1976)), cert. denied, 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991). Absent such a showing, the district court need not submit the defense to the jury. See id. at 1057.
 
 
 22
 Romano claims that Moysif's display of a gun at the auto-body shop on August 19 was sufficient to make out the defense of coercion and duress. However, because conspiracy is an inchoate crime, Romano was required to demonstrate that the necessary threatened force was present at the time of his agreement to participate in the conspiracy. Cf. United States v. Tejada, 956 F.2d 1256, 1264 (2d Cir.) ("Conspiracy, as an inchoate crime, commences with the agreement."), cert. denied, --- U.S. ----, 113 S.Ct. 124, 121 L.Ed.2d 80 (1992). He clearly has failed to do so.
 
 
 23
 As early as August 16, 1991, Romano actively was attempting to sell one-half kilogram of heroin. It should be recalled that August 16 was the day that Moysif, Badalamenti and Genna went to Romano's auto-body shop in Queens and waited while Romano made repeated attempts to locate a buyer for the heroin. Furthermore, Romano's effort to sell the heroin continued unabated over the next two days as he attempted to find a buyer for the heroin in Long Island while remaining in contact with Moysif through the use of beepers and telephones. Finally, as the district court pointed out, Romano himself alluded to the previously formed conspiracy when Moysif came to see him on August 19, 1991: before Moysif pulled out the gun, Romano "[a]pologized and said he was trying to get the money." The evidence demonstrated that Romano was a member of the conspiracy as early as August 16, 1991, three days prior to the date that Moysif displayed the gun to Romano. Thus, it is clear that there was insufficient evidence to make out the defense of duress, and therefore, that the district court properly denied Romano's request for a corresponding jury instruction.
 
 II. Sufficiency of the Evidence
 
 24
 Mogorichev argues that the evidence against him was insufficient as a matter of law to sustain his conviction. We reject this argument as wholly without merit. A defendant who challenges the sufficiency of the evidence is faced with a formidable burden. United States v. Rivera, 971 F.2d 876, 890 (2d Cir.1992). The pieces of evidence must be viewed in conjunction, not in isolation, United States v. Benitez, 920 F.2d 1080, 1088 (2d Cir.1990), with every inference drawn in the Government's favor, Rivera, 971 F.2d at 890. The existence of, and a defendant's participation in, a conspiracy often is proved by circumstantial evidence. United States v. Gordon, 987 F.2d 902, 906-07 (2d Cir.1993). This is so because, by its very nature, conspiracy is a secretive operation. United States v. Pitre, 960 F.2d 1112, 1121 (2d Cir.1992). "A conviction for conspiracy must be upheld if there was evidence from which the jury could reasonably have inferred that the defendant knew of the conspiracy charged in the indictment and that 'he associat[ed] himself with the venture in some fashion, "participat[ed] in it as something that he wish[ed] to bring about," or "[sought] by his action to make it succeed." ' " United States v. Vargas, 986 F.2d 35, 39 (2d Cir.) (quoting United States v. Johnson, 513 F.2d 819, 823 (2d Cir.1975) (quoting United States v. Peoni, 100 F.2d 401, 402 (2d Cir.1938))) (alterations in Vargas ), cert. denied, --- U.S. ----, 113 S.Ct. 2417, 124 L.Ed.2d 640 (1993).
 
 
 25
 In this case, it is apparent that there was more than sufficient evidence to allow a rational juror to conclude that Mogorichev was a member of the conspiracy. First, on September 5, Moysif called Mogorichev and explained how the proposed one-half kilogram deal with Badalamenti had fallen through and described how Podlog had berated him and refused to do business with him. Second, it clearly was reasonable for the jury to infer that Mogorichev's conversation with Chernyakhovsky about obtaining "labels" from Roizis and disposing of "shirts" and "sleeves" referred to heroin sales, and there was ample evidence presented at trial that established that Roizis was the mastermind behind the heroin smuggling and distribution scheme. Cf. United States v. Labat, 905 F.2d 18, 22 (2d Cir.1990) (jury could infer from "furtiveness and the contents" of a telephone conversation in which defendant discussed selling "shoes" that he was associated with another in narcotics distribution scheme).
 
 
 26
 Finally--and clearly the most damning--was the evidence of Mogorichev's dealings with Agent Cardinali. It was established at trial that Moysif was a distributor of heroin. When Cardinali called Moysif's beeper on September 25, Mogorichev responded. When Cardinali told Mogorichev that he wanted to talk to Moysif about a few things, Mogorichev replied, "[y]ou can talk to me about it ... [it's the] same thing, just its me, you understand." He further informed Cardinali that he was Moysif's "partner." The next day, Mogorichev informed Cardinali that he could fulfill all of Cardinali's heroin requirements and that it was the "same thing, same people." Mogorichev also told Cardinali that he was aware that Cardinali picked up a "catalog" each month from Moysif. With this evidence at hand, it is clear that the jury could have reasonably inferred that Mogorichev was a part of the conspiracy charged in the indictment. See Vargas, 986 F.2d at 39.
 
 III. Sentencing Issues
 A. Romano
 
 27
 Romano contends that the district court should have granted him a downward departure, pursuant to U.S.S.G. Sec. 5K2.12, which specifically authorizes such a departure where a defendant has committed an offense under coercion or duress. This contention is groundless. It is axiomatic that a defendant may not appeal a district court's refusal to grant a downward departure because that decision is "inherently discretionary" and "Congress did not intend to provide appellate review" of such decisions. United States v. Sharpsteen, 913 F.2d 59, 62 (2d Cir.1990) (quoting United States v. Colon, 884 F.2d 1550, 1554 (2d Cir.), cert. denied, 493 U.S. 998, 110 S.Ct. 553, 107 L.Ed.2d 550 (1989)). Whether a district court was aware of its authority to grant a departure is an issue that may be presented for appellate review. United States v. Caceda, 990 F.2d 707, 709 (2d Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 312, 126 L.Ed.2d 259 (1993).
 
 
 28
 In this case, although Romano combines his attack on the district court's disposition of his request for departure with his claim that the court was unaware of its authority, a review of the record reveals that the court understood its authority to depart but simply found no basis for doing so. The court stated:
 
 
 29
 He was in it [the conspiracy] before then. Nobody put a gun to his head to get him into the conspiracy.
 
 
 30
 . . . . .
 
 
 31
 As I understand the guideline relating to coercion, it reads that if the defendant committed the offense because of serious coercion, and I think that he was well into the offense before arguably there was any coercion, so I find specifically there was no coercion warranting any downward departure....
 
 
 32
 Tr. at 7, 14. Accordingly, we decline to review this decision of the district court.
 
 B. Mogorichev
 
 33
 The district court found that it was reasonably foreseeable to Mogorichev that the conspiracy involved one hundred or more grams of heroin and, therefore, sentenced him to a sixty-three month term of imprisonment--the minimum prescribed by the Sentencing Guidelines. See U.S.S.G. Sec. 2D1.1(c)(9). Mogorichev argues that the district court clearly erred in determining that it was reasonably foreseeable to him that the conspiracy involved one hundred grams or more of heroin. We reject this argument.
 
 
 34
 A court is entitled to consider "all transactions engaged in by [a defendant] or by his coconspirators ... if the transactions were either known to him or reasonably foreseeable to him." United States v. Negron, 967 F.2d 68, 72 (2d Cir.1992). Even quantities of narcotics sold prior to the defendant's entry into a conspiracy may be included for sentencing purposes if he knew or reasonably should have known about those quantities. United States v. Martinez, 987 F.2d 920, 926 (2d Cir.1993). The Government need only establish the amount of narcotics foreseeable to the defendant by a preponderance of the evidence and the district court's findings in this regard will not be disturbed unless clearly erroneous. Rivera, 971 F.2d at 892.
 
 
 35
 It is clear to us that Mogorichev knew or should have known that more than one-hundred grams of heroin were involved in the conspiracy. He was fully aware of the attempted one-kilogram sale by Moysif to Badalamenti between September 2 and 5. He also was aware that Podlog was Moysif's supplier for that deal and that Moysif had another supplier, Roizis, who Mogorichev himself attempted to obtain heroin from. Moreover, Mogorichev was fully aware of Moysif's dealings with Cardinali and knew that Cardinali had never placed an order for less than 125 grams of heroin. Accordingly, it is apparent that Mogorichev was aware that the conspiracy involved more than one hundred grams of heroin both prior to and after his entry into the conspiracy. Thus, the district court did not clearly err by attributing one-hundred grams or more of heroin to Mogorichev as relevant conduct for purposes of sentencing.
 
 C. Badalamenti
 
 36
 Badalamenti claims that the district court clearly erred in finding his relevant conduct involved slightly more than one-and-one-half kilograms of heroin and in sentencing him to a 135-month term of imprisonment. We reject these claims. Badalamenti concedes that the evidence at trial established that he was involved in the purchases of one ounce and of one-half kilogram of heroin from Moysif in August of 1991. However, Badalamenti takes issue with attributing to his relevant conduct the attempted one kilogram purchase from Moysif in September of 1991. Thus, the sole issue is whether the district court clearly erred with regard to this amount of heroin.
 
 
 37
 The evidence showed that on September 2, 1991, Badalamenti told Moysif that he had a buyer for one kilogram of heroin and Moysif made arrangements to obtain the heroin from Podlog. On September 5, Moysif informed Badalamenti that he had the heroin available for him. Badalamenti told Moysif at this time that the customer was no longer interested, but he renewed his request for the heroin several days later. After Moysif assured him that he could provide the agreed upon amount, Badalamenti persisted in his requests until September 14, when it became apparent that Moysif would be unable to provide the heroin. Given these facts, the district court did not clearly err in counting the kilogram of heroin in assessing Badalamenti's relevant conduct. Furthermore, contrary to Badalamenti's argument, the fact that the deal never was consummated does not affect our conclusion. See, e.g., United States v. Beaulieau, 959 F.2d 375, 379 (2d Cir.1992) (proper to include amounts negotiated but not actually distributed); U.S.S.G. Sec. 2D1.1, Application Note 12.
 
 D. Genna
 
 38
 Genna argues that he was sentenced improperly to the ten-year statutory minimum under the provisions of 21 U.S.C. Sec. 841(b). The district court found that 900 grams of heroin was attributable to Genna directly and, accordingly, concluded that the applicable offense level was 30, which carried a sentencing range of 97 to 121 months. See U.S.S.G. Sec. 2D1.1(c)(7). The district court further found that it was reasonably foreseeable to Genna that the conspiracy involved more than one kilogram of heroin, thereby implicating the ten-year statutory minimum of section 841(b)(1). However, the district court did not assign Genna an offense level of 32, the Guidelines level established for a quantity of heroin exceeding one kilogram. Offense level 32 carries a sentencing range of 121 to 151 months. Accordingly, it appears that Genna was sentenced within the range established for level 30, which is below the range applicable to the relevant conduct identified by the district court. Genna contends that only 625 grams of heroin should have been attributed to him for sentencing purposes in any event. This amount would result in an offense level of 28 and a sentencing range of 78-97 months. His primary complaint is that the district court erred by attributing 400 grams of heroin to him in connection with his August 31 purchase from Moysif and he argues that, although he originally inquired about 125 or 400 grams of heroin, only the 125 grams actually purchased are relevant for sentencing purposes.
 
 
 39
 Genna relies on Application Note 12 to section 2D1.1 of the Guidelines, which states that "the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount." Genna argues that, because he completed the 125-gram deal with Moysif, the weight under negotiation is inapplicable. Although we have not had a prior occasion to address this specific issue in connection with Application Note 12, our de novo review of the district court's application of the Guidelines, United States v. Stanley, 12 F.3d 17, 20 (2d Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1572, 128 L.Ed.2d 216 (1994), leads us to conclude that the district court erred by attributing the 400 grams of heroin at issue to Genna.
 
 
 40
 It is an elementary maxim of statutory construction that, whenever possible, courts are required to give effect to "every clause and word of a statute." Inhabitants of the Township of Montclair v. Ramsdell, 107 U.S. 147, 152, 27 L.Ed. 431 (1883). Following this rule, it is clear to us that Application Note 12 to section 2D1.1 requires that, in addition to the uncontested 500 grams, only 125 additional grams of heroin are attributable to Genna's relevant conduct. As we noted above, Application Note 12 states that "[i]n an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount" for sentencing purposes. (emphasis added). There is no ambiguity in this Note and we can ascertain no reason why the plain language should not be followed. Cf. United States v. Alaga, 995 F.2d 380, 383 (2d Cir.1993) (Application Note 12 clear on its face and there is no reason to go beyond plain language), cert. denied, --- U.S. ----, 114 S.Ct. 886, 127 L.Ed.2d 80 (1994).
 
 
 41
 In this case, the transaction in question was not incomplete in any sense. On August 30, Genna informed Moysif that he had a potential buyer for either 125 or 400 grams of heroin. Moysif told Genna that obtaining the heroin was not a problem and that he simply needed to know "when" and "how much." Later that day Genna told Moysif that he would need 125 grams, and the next day Genna purchased the 125 grams of heroin from Moysif in exchange for $17,000, thereby completing the distribution. Accordingly, "the weight under negotiation in an uncompleted distribution" is not applicable in this case. Cf. United States v. Stevens, 985 F.2d 1175, 1182-83 (2d Cir.1993) (quantity "under negotiation" normally governs in the case of a "transaction that was under negotiation but not completed"); United States v. Jacobo, 934 F.2d 411, 416 (2d Cir.1991) ("quantity under negotiation" governs "[i]f the narcotics transaction was not completed"). In cases in which the narcotics distribution was completed, we have held that, notwithstanding varying amounts involved in the negotiations leading up to the final conspiratorial agreement, it is the amount ultimately agreed upon that should be punished.
 
 
 42
 In United States v. Tejada, the defendant and an undercover law enforcement agent conducted negotiations for the sale of cocaine. These negotiations included discussions of amounts ranging from as little as 1.91 kilograms to as much as 2 kilograms. 956 F.2d at 1259. Ultimately an agreement to deliver two kilograms of cocaine was reached. On the date of the sale, however, only 1.989 kilograms actually were delivered. Id. The district court determined that it was this amount that was applicable in determining the defendant's base offense level. Id. at 1264. In reversing the district court's decision, we stated that the Guidelines "display[ ] a clear resolve to punish the agreement" and concluded that the defendant's offense level should have been calculated on the basis of the two kilograms that were agreed to be delivered, not the lesser amount actually delivered. Id.
 
 
 43
 In United States v. Moon, 926 F.2d 204, 209 (2d Cir.1991), a case that preceded Tejada and is on all fours with the case at bar, the defendant and a coconspirator engaged in discussions concerning the availability of "one or two kilos" of cocaine.[2] The final agreement between the two, however, was for only one kilogram. We concluded that because one kilogram was the amount agreed upon and exchanged in the transaction, that amount should control at sentencing. Id. at 209-10. The identical situation is present in this case, i.e., the amount ultimately agreed upon is the same amount as that actually delivered. Accordingly, only 125 grams of heroin should have been attributed to Genna in connection with the August 31 sale.
 
 
 44
 With regard to the district court's finding that it was reasonably foreseeable to Genna that the conspiracy involved more than one kilogram of heroin, we determine this finding to be clearly erroneous. Genna was involved in only two transactions--the 500-gram deal involving Badalamenti and Moysif and the 125-gram sale on August 31. The record reveals no other evidence that satisfies us that Genna knew or should have known that the conspiracy involved more than one kilogram of heroin. In Negron we recognized that "[r]elevant conduct includes acts committed by the defendant himself and acts for which he would 'be otherwise accountable,' such as acts of coconspirators in furtherance of the conspiracy. A defendant is not necessarily, however, held responsible for all of the conduct of the conspiracy." 967 F.2d at 72 (quoting U.S.S.G. Sec. 1B1.3(a)(1) (1991)). Relying on the Guidelines, we continued:
 
 
 45
 "In the case of criminal activity undertaken in concert with others, whether or not charged as a conspiracy, the conduct for which the defendant 'would be otherwise accountable' also includes conduct of others in furtherance of the execution of the jointly-undertaken criminal activity that was reasonably foreseeable by the defendant.... Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level...."
 
 
 46
 Id. (quoting U.S.S.G. Sec. 1B1.3, Application Note 1 (1991)) (emphasis added in Negron ). Here, Genna's conspiratorial agreements involved only 625 grams of heroin. Neither the district court nor the Government directs us to any facts indicating that Genna was aware, or should have been aware, of any additional heroin transactions.
 
 CONCLUSION
 
 47
 Accordingly, we vacate Genna's sentence and remand his case for resentencing within the Guidelines range applicable to conduct involving 625 grams of heroin. We affirm the judgement of the district court in all other respects.
 
 
 
 *
 Defendant-appellant Calogero Badalamenti submitted his argument to the Court
 
 
 **
 Hon. Robert L. Carter of the United States District Court for the Southern District of New York, sitting by designation
 
 
 [1]
 Twelve other defendants also were charged in this Count. Counts Two and Three charged Moysif and Kats with distribution of and possession with intent to distribute heroin, in violation of 21 U.S.C. Secs. 812, 841(a) & (b)
 
 
 [2]
 Both Tejada and Moon involved Application Note 1 in section 2D1.4, the predecessor to Application Note 12 in current section 2D1.1